283 N.J. Super. 32 (1995)
660 A.2d 1274
STATE IN THE INTEREST OF J.G., N.S., AND J.T.
Superior Court of New Jersey, Chancery Division Family Part Hudson County.
Decided March 7, 1995.
*35 Susan L. Reisner, Public Defender, (Richard S. Hanlon, for the juvenile, J.G., Honoria J. Forte, Assistant Deputy Public Defender, for the juvenile, N.S., Adam B. Reisman, for the juvenile, J.T.).
Carmen Messano, Hudson County Prosecutor, (Craig R. Weis, Assistant Prosecutor, for the State).
Deborah T. Poritz, Attorney General, amicus curiae State of New Jersey (Lisa Sarnoff Gochman, Deputy Attorney General, appearing).
Crummy, Del Deo, Dolan, Griffinger & Vecchione, for amicus curiae American Civil Liberties Union of New Jersey, (John V. Jacobi, and Lenora M. Lapidus, appearing).
JOSE L. FUENTES, J.S.C.
These cases involve an issue of first impression in this jurisdiction. N.J.S.A. 2C:43-2.2a and N.J.S.A. 2A:4A-43.1 have been challenged, both facially and as applied to the facts in these cases, as unconstitutional under the Fourth and Fourteenth Amendments of the United States Constitution and Article I, ¶¶ 1 and 7 of the Constitution of the State of New Jersey. The issue to be decided is whether a juvenile charged with, or convicted of, aggravated sexual assault must submit to HIV testing, with the expectation that the results of the test would be revealed to the Office of Victim-Witness Advocacy, which would in turn reveal the test results to the victim.

PROCEDURAL HISTORY
In this case, three juveniles have been charged with aggravated sexual assault pursuant to N.J.S.A. 2C:14-2a(1). The complaints charge that on May 7, 1994, juveniles, J.G., age 14, N.S., age 14, and J.T., age 15, committed acts of aggravated sexual assault upon *36 the victim by forcing her to engage in anal and oral intercourse in violation of N.J.S.A. 2C:14-2a(1).[1]
The victim, C.H., was 10 years old at the time of the alleged incident. It has been stipulated by all parties that the victim is and was, at the time of the incident, mentally retarded. Following the filing of the delinquency complaints, the victim of the aggravated sexual assault in this matter, pursuant to N.J.S.A. 2A:4A-43.1 and N.J.S.A. 2C:43-2.2a, requested and the State, thereafter moved[2] to compel the juveniles to "submit to an approved serological test for acquired immune deficiency syndrome (AIDS) or infection with the human immunodeficiency virus (HIV) or any other related virus identified as a probable causative agent of AIDS."[3]
*37 The juveniles, joined by amicus curiae, the American Civil Liberties Union of New Jersey,[4] opposed the State's motion of the HIV testing, on the grounds that these statutes, on their face and as applied to the juveniles charged in this case, unconstitutionally deprives them of their rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and Article I, ¶¶ 1 and 7 of the Constitution of the State of New Jersey. This is an question of first impression, never before considered by any court in this jurisdiction.
An evidentiary hearing was held before this court on November 29 and 30, 1994. The parties were given an opportunity to present expert testimony. The juveniles challenging the statute presented experts who addressed three separate issues: (1) currently available methods for HIV testing; (2) medical treatment for possible exposure to HIV; and (3) psychological counseling following potential exposure through sexual assault. The testimony of the experts focused on whether testing the accused juveniles for HIV infection would be of any benefit in the diagnosis, treatment, or psychological recovery of a victim of a sexual assault.
The court heard testimony from three expert witnesses presented by the defense. The first was Dr. James Oleske. Dr. Oleske is the Francois-Xavier Bagnoud Professor of Pediatrics and Director of the Division of Allergy, Immunology and Infectious Diseases at the University of Medicine and Dentistry  New Jersey Medical School. He is also the Medical Director of the Children's Hospital AIDS Program at United Hospital of New Jersey. Dr. Oleske is Board certified in Pediatrics, Allergy/Immunology, Medical Laboratory Immunology, and Allergy/Immunology Diagnostic Laboratory Immunology. He holds a Masters Degree in Public Health from Columbia University. Dr. Oleske's background includes membership and consulting assistance in a number of national and international bodies dealing with the HIV *38 epidemic. He has also published scientific, scholarly articles and books in the field of HIV, including the first reported case, in 1983, of children with HIV infection. The court admitted Dr. Oleske and qualified him to testify as an expert in HIV related diagnosis, treatment, testing and prevention, particularly as it relates to diagnosis and treatment of children and adolescents.[5]
The second expert to testify was Dr. Patricia Kloser. Dr. Kloser is the Medical Director of AIDS Services at the University of Medicine and Dentistry  New Jersey Medical School. She also serves on the faculty of the Medical School as Associate Professor of Clinical Medicine with appointments in both internal medicine and infectious diseases and as an Associate Professor of Preventive Medicine. She is Board certified in Internal Medicine with a sub-specialty in Infectious Diseases. In 1988, Dr. Kloser founded the Newark Women's AIDS Clinic, the first clinic in the United States designed specially for women with HIV. As a treating physician and through her association with the Women's AIDS Clinic, Dr. Kloser has treated between 2,000 to 4,000 patients, including victims of sexual assaults. She is also a founding member of the New Jersey Women and AIDS Network, an advocate group for HIV infected women. She has conducted extensive research and published numerous articles in the field of AIDS, specifically she has published a book on women with HIV disease. Dr. Kloser was qualified and admitted to testify as an expert in the field of HIV diagnosis, treatment and prevention, with a specific focus on the diagnosis and treatment of women.[6]
The third expert called by the defense was Dr. Jill Greenbaum. Dr. Greenbaum has undergraduate and graduate degrees in Education *39 and Child Psychology and received a Doctorate in Education in 1983 from Columbia University. She is currently the Executive Director of the New Jersey Coalition Against Sexual Assault, a statewide organization devoted to serving the needs of victims of sexual assault. In addition to her administrative duties she provides crisis intervention counseling, emotional support, information and referrals to victims of sexual assault through a twenty-four hour crisis hotline. She has provided direct counseling in hospital settings and judicial proceedings. Her background includes nineteen years experience in the field of counseling and intervention for sexual assault victims. Dr. Greenbaum has provided crisis counseling to rape victims in emergency rooms and in therapeutic settings. She conducts speaking engagements and provides training to crisis counselors to employees of the New Jersey State Department of Health and various law enforcement agencies, among others. Dr. Greenbaum was qualified and admitted to testify as an expert in crisis counseling with survivors of sexual assault.[7]
The State chose not to present any expert testimony or submit any evidence.[8]
From the evidence presented at the hearing, the court makes the following findings.

FACTUAL FINDINGS

DIAGNOSIS AND DETECTION OF HIV
The most commonly used tests are the HIV enzyme-linked immunosorbent assay (ELISA) test followed by a confirmatory test, usually the Western Blot analysis.

*40 For anyone over the age of 15 months, the most reliable, sensitive and specific assays, serological and widely available, are the HIV ELISA test, followed by a confirmatory test, usually the Western Blot analysis. Those tests, when done together, have a high degree of sensitivity and specificity for diagnosing disease in over 15 months of age ... These are serological tests that are done when serum is taken from individuals in which, after a period of incubation, tests are run on the results by doing a culametric change on an automated piece of machinery. They are fairly standardized tests. They were first described in 1985.
[Testimony of Dr. Oleske.]
These tests detect antibodies to the virus rather than the virus itself.
Q. (Mr. Jacobi): And does that positive result indicate that the test has detected the virus?
A. (Dr. Oleske): No, it detects serological response to the virus, that serological response usually taking anywhere from three months to six months after infection with the virus before that immunology response will occur. In rare instances, people reported as long as a year, but mostly three to six months.
Q. (Mr. Jacobi): So a positive test, a positive ELISA, followed by a Western Blot test, will tell a physician what about the patient?
A. (Dr. Oleske): If it's in a high prevalence area, where the virus is seen in the community, it tells us with an accuracy of probably greater than 95 percent that that patient truly is infected with the HIV virus.
Q. (Mr. Jacobi): And what does a negative result from those tests demonstrate?
A. (Dr. Oleske): Well, a negative result tells us that the individual tested has not developed antibodies against HIV. The two interpretations to that are: one, they are truly are not infected, that the test is reliable and has good specificity and sensitivity, and that they are not infected; or alternatively, they may be in a period in which they have been infected, but not have yet developed antibodies to the HIV virus.
In other words, somewhere between the time of actual exposure to the virus to six months out, there may be a period when they do not test positive. Ninety-five percent of people by six months usually have developed antibodies and the test will be positive six months after they have been infected.
This so called "window period" testified to by Dr. Oleske is a time when an individual who may be truly infected will in fact test negative since he or she has not yet developed the antibodies necessary for detection. Dr. Oleske further testified that in ninety-five percent of the cases this "window period" lasts between three to six months from the initial point of infection. However, there have been reported cases of up to one year.
*41 There are other tests available which detect the HIV virus directly. These so called "direct tests" include HIV culture, polymerase chain reaction (PCR), and HIV antigen tests. Unlike the ELISA and Western Blot these direct tests detect the actual presence of the virus, rather than the presence of antibodies.
There are a number of both investigational, as well as expensive, assays that are available to directly detect evidence of viral infections ... and that may be positive in that early window period of time, depending upon how much virus is present. Those tests are the HIV culture, which is an actual culture of the virus in a living cell system. That usually takes about twenty-eight days before those test results will be available. It's relatively expensive and hazardous to laboratory workers because they are working with a live virus.
There is another test called a [polymerase] chain reaction or PCR, which takes advantage of the virus that have lodged themselves in the genetic material of the host human's cell and those tests may detect one in ten thousand cells that are infected with the HIV virus.
It's a very sensitive tool but has some problems with false positive results because it's so sensitive and is liable to be associated with problems with contamination. But, it done in a proper laboratory under proper controls, it provides a means for early detection.
Again, those tests while positive [are] very strong indications of infection, negative tests do not necessarily rule out infection. PCR is limited in its availability and is somewhat expensive.
[Testimony of Dr. Oleske.]
These tests are still considered experimental, used primarily for investigational and research purposes. They are used in a clinical context in limited areas where the transmission occurs from mother to child, and children under fifteen months of age. Through the use of serological tests, ELISA and Western Blot, the clinician is unable to discern the difference between true infection in the infant as opposed to the maternal antibody that the child received in utero. Therefore, these direct tests are used specifically in an attempt to diagnose earlier in life, "certainly below six months, true HIV infection as opposed to, if you will, a false positive antibody test in the infant which only means that the mother had the antibody". (Testimony of Dr. Oleske.)
These tests are not frequently used because they are time consuming, expensive, and risky to the laboratory technicians *42 performing the test. The majority of the cases still rely on the ELISA and Western Blot tests.
In the context of the present situation, where the individual may have been exposed to HIV as a result of a sexual assault, the most appropriate method for diagnosing for HIV infection is ELISA and Western Blot.

UTILITY OF TESTING ALLEGED ASSAILANT IN THE DIAGNOSIS OF SEXUAL ASSAULT VICTIM
The medical testimony in this area is uncontroverted. The HIV status of the alleged assailant or even the actual assailant would provide no useful information to a physician in his/her attempt to diagnose the victim of the assault.
Q. (Mr. Jacobi): Now Doctor, you are aware that in this case the prosecutor has filed a motion to compel the juveniles be tested for HIV is that correct?
A. (Dr. Oleske): Yes, I am aware of that.
Q. (Mr. Jacobi): Let me ask you a question based upon your expertise. Have you formed an opinion, based upon a reasonable degree of medical probability as to whether the proposed or whether HIV testing of alleged assailants in a sexual assault case would be beneficial in diagnosing the HIV status of the victim?
A. (Dr. Oleske): Yes I have.
Q. (Mr. Jacobi): And what is that opinion?
A. (Dr. Oleske): They really would provide no information on the diagnosis in a particular classification of the assaulted victim in this case.
Q. (Mr. Jacobi): Why is that?
A. (Dr. Oleske): Well, there is a number of reasons. HIV testing at any point in time does not tell us what an HIV status of a person was a month before that testing was done. In fact, it does not even tell us a few weeks before what those test results may be.
An individual tested, as I understand it in this case, at five or six months after the initial exposure, it would be impossible to determine whether that positive or negative test had any bearing on the original assault.
Q. (Mr. Jacobi): Let me ask you this Doctor. If you were treating a victim of a sexual assault what steps would you take in order to ascertain whether that victim has become infected with HIV?
A. (Dr. Oleske): Well, if it's  if they are over 15 months of age, an ELISA and Western Blot test, at the time of exposure, three months and six months later, would really give you the definitive answer as to whether that individual was unfortunately infected or not.
*43 According to the testimony of Dr. Oleske, from the point of view of diagnosing for HIV infection, a person occupies one of only three categories: (1) a person is not at risk for HIV infection having had no contacts with bodily fluids that may be infected with the virus, (2) a person may be HIV positive, or (3) a person may be at risk for infection when that person may have been in contact with HIV infected bodily fluids. A sexual assault victim occupies the third category, at risk for infection. Since the tests for diagnosing the virus cannot pinpoint the time when the victim contracted the virus, "nothing in test results of an alleged assailant will prove the victim to be in a different category."
This expert opinion was also shared by Dr. Kloser who testified:
We take the individual who is presented for testing on an individual and personal basis. We don't test the context of people who are presented to us for HIV testing. We take each person as an individual.
Therefore, the HIV status of the assailant is not useful for the diagnosis of the victim for the reasons that follow.
First, if the assailant tested negative, that could simply indicate that he was either in the "window period" and had not yet developed antibodies against HIV. He could also not be infected at all.
At the time of the attack, if we knew the assailant's results and they were reported to me as negative, I would not be doing my job by counseling anybody, specially the family of the victim that they did not have to worry and that the child did not need to be tested. It's clear that an individual can be able to infect other individuals for a period of up to six months with not having a positive antibody [sic] so there is no security ... in knowing that it's negative ... and therefore, really no difference in how I would approach the patient's diagnosis.
[Testimony of Dr. Oleske.][9]
Second, knowing that the assailant tested positive would not change the approach for diagnosing the victim in any way. As testified to by Dr. Oleske, the diagnostic "work-up would not be changed, whether I knew or did not know the assailant was HIV positive". This is because the positive test of the assailant would give no indication whether actual transmission had occurred. As *44 testified to by Dr. Kloser, "a woman can have multiple exposures to an HIV positive person and still be negative." Due to the uncertainty of whether transmission has actually occurred, physicians cannot assume that an individual is in fact infected because her assailant was infected.
Finally, testing the juveniles in this case even at the time the motion was made by the State, would provide no useful information about their particular HIV status at the time of the assault. A positive test result means only that they are HIV positive at the time the test was administered. It provides no information which a physician can use to relate back and determine the HIV status of these juveniles at the time of the attack. This hurdle would not be overcome even if direct viral tests which detect the actual presence of the virus are used. Even assuming the general availability of these tests, they still provide no useful information to the diagnosing physician as to the HIV status of the victim. As testified to by Dr. Oleske, testing the juveniles "may give you some solid information about the accused, it does not tell you about the victim. The application of those tests, if they are going to be applied to help the victim, should be used on the victim".
The only rational, scientifically viable method of assisting the victim in diagnosing her HIV status is to test her. The assailants' test results are simply irrelevant.

POST-EXPOSURE TREATMENT
It has been demonstrated that a sexual assault victim is considered to be "at risk" of contracting HIV. The next question which must be considered by the court is whether there are any available, post-exposure prophylactic measures for an individual who is at risk of HIV infection. There has been some experimental usage of the drug Zidovidinne (AZT) in certain limited areas.[10] *45 However, AZT is not recommended as a prophylactic in cases of possible exposure through sexual contact, and the United States Food and Drug Administration has not approved AZT for this type of preventive usage.
In addition to lacking scientific support as a prophylactic, AZT is not recommended for prophylactic use because of the potential risks involved, including such side effects as anemia, nausea, vomiting, headaches, and toxicity.
Thus, the only appropriate treatment plan for a sexual assault victim is counseling and information about the possible transmission, and offering testing and retesting as medically needed. It is clear and uncontroverted from the expert testimony presented to the court that information about the juveniles' HIV status would not alter this treatment plan.
Knowing the test results of the alleged assailant would not change this course of clinical treatment. If the alleged assailant tested negative, the victim would be counseled about the possibility that the alleged assailant was not the actual assailant. The advice and treatment given the victim would not be modified in light of the test result. If the alleged assailant tested positive, the victim would be counseled that this result means, at most, that she may have been exposed. Again, the advice treatment given the victim would not change. The test results of the alleged are therefore useless from a clinical treatment and prevention perspective.
[Testimony of Dr. Oleske.]
This would not change even after an adjudication of guilt. Medical treatment is patient specific. Knowing the source of the possible infection is not medically meaningful to the treating physician.
[B]ecause when are taking a look at someone's personal health, we are really not interested in how they got their disease. We are interested in the base line health of the patient, him or herself, and we take each person as an individual, evaluate their immune system separately and care for that person as appropriate.

*46 [Testimony of Dr. Kloser.]
The treatment option of using AZT as a preventive agent immediately after possible exposure would also not be affected by knowing the HIV status of the assailant.
The testing of the assailant would only tell us a limited amount of information that would not be used to base their [treating physicians] therapeutic decisions.
[Testimony of Dr. Oleske.]
The possible, theoretical utility of using AZT exists only if it is administered hours after exposure. This has been done in the so called "needle stick" program.[11] Prophylactic use of AZT is not recommended in the area of possible exposure to HIV through sexual assault. Many sexual assault cases are not reported for days or even months. Even if the assault is reported within hours of its occurrence, the assailant may not be in police detention or otherwise available to be tested for days or months. However, even assuming the immediate reporting of the assault, coupled with the apprehension of the assailant, the HIV status of the assailant is simply not medically relevant to the course of treatment adopted for the particular victim.

PSYCHOLOGICAL RECOVERY OF THE VICTIM
In this area, the court heard the uncontroverted testimony of Dr. Jill Greenbaum, the Executive Director of New Jersey Coalition Against Sexual Assault, who was admitted as an expert in crisis counseling with survivors of sexual assault. According to Dr. Greenbaum, the goal of crisis counseling is "to empower" the victim, enabling her to regain control over her life. In this context empowerment means:
providing information to victims/survivors so that they may make informed decisions about what to do in their own lives. In other words, survivors are encouraged to take control, of their lives again, to make their decisions about going through testing and pre- and post-test counseling of HIV, because relying upon the test results of another person who may have transmitted the virus, is not focusing on and being responsible for oneself.
[See report of Dr. Greenbaum at 21.]
*47 In fact, the factors identified by Dr. Greenbaum  "clear and concise information that will give her [victim] the opportunity to control her own life and to focus on her own healing and recover," mirror the "Legislative Standards to Insure Rights of Crime Victims", N.J.S.A. 52:4B-44b(19):
advise and counsel, or refer for advice or counseling, victims of sexual assault, or other criminal acts involving a risk of transmission of disease, concerning available medical testing and assist such victims, or refer such victims for assistance, in obtaining appropriate testing, counseling a medical care and in making application to the Violent Crimes Compensation Board for compensation for the costs of such testing, counseling and care.
The Legislature, however, in adopting N.J.S.A. 52:4B-44b(19), further adopted N.J.S.A. 52:4B-44c requiring the mandatory testing of the assailant and the disclosure, upon the victim's request, of his HIV status. It is at this juncture where Dr. Greenbaum deviates from the legislative formula.
Q. (Mr. Jacobi): In the course of crisis counseling, is it helpful, in your view, to seek information with respect to the H.I.V. status of the alleged sexual assailant?
A. (Dr. Greenbaum): No.
Q. (Mr. Jacobi): Why is that?
A. (Dr. Greenbaum): Because through all of the reading that I have done, and the research, it is clear that knowing another person's status does not give you information about your own status and that's what we focus on when we talk with survivors; their own healing and recovery and their need to be in control.
Q. (Mr. Jacobi): What information with respect to H.I.V. is helpful to survivors of sexual assault?
A. (Dr. Greenbaum): It's very important that they understand there is the possibility of transmission, though it is small, and that they consider getting a baseline test to assess their own possibility of having H.I.V. already. That they know when to get tested, where to get tested and that there are free and confidential testing sites across the State and they need to go at three-month intervals for a year.
Q. (Mr. Jacobi): In your experience, would it assist a woman in regaining peace of mind, or a sense of repose, to gain information about the H.I.V. status of the alleged sexual assailants?
A. (Dr. Greenbaum): No.
Q. (Mr. Jacobi): Why is that?
A. (Dr. Greenbaum): Because, number one, it continues to tie her to the assailants, which is not psychologically healthy. She needs to move beyond, through and move beyond the trauma. In addition to that, at this point in time, *48 and for the foreseeable future, there is no way to know if that test result is; number one, accurate; and number two, when the testing occurred in relation to the event. There are just a whole lot of issues.
Not only is testing the assailant not helpful in the psychological recovery of the victim, but it may actually be harmful.
If you tell the victim that we've the tested the assailant and they are not negative, and they are in that window period, we may do them actual harm because they perceive that there is no risk [to] them and [they] may not continue with their medical care and may not continue with testing. They may decide that they are at risk and, in fact they are at risk and may become infected.
If you tell them the assailant was positive, we know that the majority of times a single attack on the street is not going to result in the transmission of the virus. The perception of the victim and his family may be that I am now automatically infected with HIV. So that I think ... there is more potential harm, serious harm psycho-socially to a child and a family being given information that has nothing to do with their risk of infection or their own status, which would be able to be identified by careful compassionate care and support to the family and the child which includes the testing....
[Testimony of Dr. Oleske.]
Whether testing the assailant reveals that he is HIV positive or negative, there is the clear potential that this information may be misused by the victim to draw the wrong conclusion about her own particular medical and psychological needs. If the test is negative, it may give her a false sense of security about the real implications of the attack and her need to be individually tested. If the test is positive, she may wrongfully conclude that she is in fact infected. This erroneous overreaction may have profound psychological effects, needlessly producing a sense of doom when in fact the actual probability for infection is extremely low. Medically, the information would be of no value to the diagnosing or treating physician. Psychologically it continues to tie her to the assailant and the assault, which is counter productive to her psycho-social recovery.
Therefore, based on the expert testimony and evidence presented, the court finds that:
1) Testing the juveniles for HIV infection would be of no use in the diagnosis of the victim.
2) Testing the juveniles would provide no benefit in the medical treatment of the victim of sexual assault.

*49 3) Testing the juveniles would provide no benefit in the psycho-social recovery of the victim of sexual assault.

LEGAL ANALYSIS
N.J.S.A. 2A:4A-43.1 and N.J.S.A. 2C:43-2.2a provide for mandatory HIV testing of those convicted of or charged with sexual assault or aggravated sexual assault pursuant to N.J.S.A. 2C:14-2a or c. The results of said tests would then be given to the Office of Victim-Witness Advocacy, which would in turn reveal the test results to the victim. N.J.S.A. 2C:43-2.2b and e. Pursuant to N.J.S.A. 2C:43-2.2f, the test results are confidential to the extent that
a health care provider and employees of the Department of Corrections, the Office of Victim-Witness Advocacy, a health care provider, health care facility or counseling service shall not disclose the result of a test performed pursuant to this section except as authorized herein or as otherwise authorized by law or court order.
A notable exclusion from this list is the victim herself. Presumably, she is permitted to reveal the test results to whomever and however many persons she wishes.[12]
The involuntary taking of blood from one charged with aggravated sexual assault, the testing of that blood for the presence of HIV, and the disclosure of the results of those tests to the victim, who could potentially reveal those results to an infinite number of others, perhaps even the media, implicates two specific constitutional guarantees.

I. The Fourth Amendment guarantee against unreasonable searches and seizures.

As a threshold matter, the court notes that it is well settled that the involuntary removal of blood from the body is a search within the contemplation of the Fourth Amendment. In Schmerber *50 v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966), the Supreme Court made clear that:
[c]ompulsory administration of a blood test ... plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment.... Such testing procedures plainly constitute searches of "persons" and depend antecedently upon seizures of "persons," within the meaning of that Amendment.
A second issue which must be resolved at the outset is that the testing at issue is not being sought by the prosecutor for evidentiary purposes. There is no foreseeable way the results could be admissible into evidence, so that there is no possible law enforcement rationale behind this particular legislation. This issue is important in that it determines the correct Fourth Amendment test to be applied to this statutory provision. Thus, whereas Schmerber, supra, is useful in establishing that mandatory blood tests implicate the Fourth Amendment, the test applied by the Court in that case would not be applicable here. That is because the blood test at issue in Schmerber was administered in order to determine whether the defendant was driving while intoxicated, an obvious element of the offense with which he was charged. Thus, the results were sought for law enforcement and evidentiary purposes and the traditional probable cause/warrant analysis was applicable.
Therefore, the court finds that the most appropriate analysis is contained in the companion cases Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Those cases involved constitutional challenges to mandatory drug and alcohol testing of railroad employees and of employees of the United States Customs Service, respectively. The Court applied a "special needs" analysis to these blood and urine testing schemes. Specifically, the Court dispensed with any requirement of individualized suspicion or probable cause in
certain limited circumstances, [where] the Government's need to discover such latent or hidden conditions ... is sufficiently compelling to justify the intrusion on *51 privacy entailed by conducting such searches without any measure of individualized suspicion.
[Von Raab, supra, 489 U.S. at 668, 109 S.Ct. at 1392.]
The Court went on to conduct a balancing test between the competing interests in those cases, and decided the testing schemes at issue passed constitutional muster because the governmental interests were compelling enough to outweigh the infringement on individual privacy. However, it is important to note that the Court relied heavily on the diminished expectation of privacy the employees at issue could claim, given that it is their voluntary decision to seek employment with the government in positions of great public importance or sensitivity.[13]See Id. at 672, 109 S.Ct. at 1394. Regardless of the outcome of the test's application in Skinner and Von Raab, it seems clear that the "special needs" balancing test is the most appropriate Fourth Amendment analysis with which to examine the mandatory HIV testing scheme at issue in the case at bar.
There are three separate questions to be asked in conducting such a balancing test. First, how intrusive is the statute upon a fundamental individual liberty, in this case the guarantee against unreasonable searches and seizures? The court finds that the intrusion here is substantial. First of all, the statute, on its face, applies to defendants charged with aggravated sexual assault. At the charge or accusation level, the defendants have not been convicted of anything, and have an entire panoply of due process protections against just what this statute seems to create  a presumption of guilt. Especially in light of their right to a presumption of innocence, the defendants are entitled to an undiminished expectation of privacy.[14] The only exception relates to *52 those matters which the State may probe, based on probable cause that information essential to the prosecution of the case would be gathered. Furthermore, any compulsory medical procedure must be deemed extremely invasive of an individual's right to determine what, if anything, will be done to his body. It is difficult to imagine a search and seizure more intrusive then forcing an individual to first submit to the withdrawal of blood from his body, and then testing that blood for a disease which subjects those who have it to widespread and invidious discrimination,[15] and then revealing the results of that test to an individual who is free to pass that information on to whomever she wishes.
The second factor to consider is how important is the government interest advanced by the state? The court finds that assisting the victims of sexual assault and other crimes is a legitimate and compelling governmental interest. See N.J.S.A. 52:4B-35, recognizing that:
The Legislature has the responsibility to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process.
In furtherance of this declared policy, the Legislature has codified specific, enumerated rights of crime victims. These rights include, but are not limited to the right to: receive medical assistance; be informed about remedies, financial assistance and social services; and be compensated for loss whenever possible. See N.J.S.A. 52:4B-36. Finally, the Legislature created standards to insure the rights of crime victims. See N.J.S.A. 52:4B-44. It is section c of this statute which is the subject of this Constitutional challenge.
*53 The court having found that the intrusion into the right of privacy is substantial, and having further found that the State has a legitimate and compelling governmental interest in assisting and protecting the victims of sexual assault, the third and final prong of the balancing test requires the court to determine whether the interference with the fundamental right is narrowly tailored or necessary to achieve the advanced compelling state interest. The statutory scheme "must bear a close and substantial relation" to declared government interest. Von Raab, supra, 489 U.S. at 676, 109 S.Ct. at 1396.
The State has objected to the court's decision to conduct an evidentiary hearing, arguing that the judiciary does not sit as a body reviewing the wisdom of legislative decisions. However, the State acknowledges that the court can determine whether legislative action is within constitutional limits. Piscataway Tp. Bd. of Ed. v. Caffiero, 86 N.J. 308, 318, 431 A.2d 799 (1981), appeal dismissed, 454 U.S. 1025, 102 S.Ct. 560, 70 L.Ed.2d 470 (1981); State v. Bulu, 234 N.J. Super. 331, 342, 560 A.2d 1250 (App.Div. 1989).
The State acknowledges that the drawing of blood in this case is a search under the Fourth Amendment of the United States Constitution. That being the case, the statute's mandate to compel the drawing of blood, and its subsequent analysis for HIV, squarely raises constitutional questions which this court is duty bound to resolve. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); Robinson v. Cahill, 69 N.J. 133, 351 A.2d 713 (1975).
In order for the court to make a Von Raab type of "special needs" analysis, it must first assess the medical and/or psychological utility of informing the victim of sexual assault of the HIV status of an alleged or adjudicated assailant. This type of analysis requires sophisticated knowledge about a highly specialized area of medicine.
The medical testimony has revealed that whether a defendant's HIV test comes out positive or negative is irrelevant to the steps *54 that a victim of a sexual assault should take in monitoring her own health care or HIV status. A negative test result of a defendant does not mean the defendant does not have HIV. The defendant could be in a "window period" between his contracting the virus and his body producing antibodies against the virus, which is what the blood tests detect  the antibodies, not the virus itself. Thus, the fact that the defendant tests negative should have absolutely no effect either on the victim's peace of mind or health care decisions. In fact, a negative result could even give the victim a false sense of security over her own status, causing her to neglect routine follow up care. Furthermore, what value would a positive test result on the defendant mean to the victim? If she shows no signs of the virus in her own body, a doctor would do no more than advise her to continue to be tested periodically. No course of treatment would be commenced before she tests positive for the virus. The court does not need to reach the issue of whether the juveniles' privacy rights outweigh the State's compelling interest in assisting crime victims. Given these medical findings, this testing scheme fails the Von Raab test, because it does not serve to achieve the compelling state interest which the court has found to justify its enactment.
Similarly, since the court has found a federal constitutional basis for deciding the questions presented, it does not reach any of the state constitutional issues raised by the juveniles.
The 1990's have been classified as the "plague years." These are times when fundamental human interaction is shrouded with the specter of death. In our zeal to deal with a disease which at this time is one hundred percent fatal, we have lashed out at its victims, at times preventing children from attending schools, at times preventing people from earning a living, at times denying people the basic need for human contact. In our fear and ignorance we have sought to help those, who through no fault of their own, become exposed to this deadly illness. However, it is the true measure of a free people to stand firm for the core principles that make them free, when the tide of ignorance and *55 fear is running the other way. Therefore, the court rules and determines that:
1) N.J.S.A. 2C:43-2.2a and N.J.S.A. 2A:4A-43.1, requiring the involuntary taking of blood from a person charged with or convicted of aggravated sexual assault pursuant to N.J.S.A. 2C:14-2(1), is a search within the meaning of the Fourth Amendment of the United States Constitution.
2) In determining the constitutional propriety of the search, the court must utilize the "special needs" analysis contained in the companion cases Skinner and Von Raab, supra.

3) Under the "special needs" test, the involuntary extraction of blood, required by the statutes in this case, is a substantial intrusion into the juveniles' right of privacy contained in the Fourth and Fourteenth Amendments of the United States Constitution.
4) The State has a legitimate and compelling governmental interest in assisting and protecting the victims of sexual assault.
5) The statutory scheme does not bear a close and substantial relation to the compelling governmental interest in assisting victims of sexual assault.
The court, therefore, holds that N.J.S.A. 2C:43-2.2a and N.J.S.A. 2A:4A-43.1 are unconstitutional as violative of the juveniles' rights under the Fourth and Fourteenth Amendments of the United States Constitution. State's motion to compel the juveniles to submit to an approved serological test for acquired immune deficiency syndrome (AIDS) or infection with the human immunodeficiency virus (HIV) or any other related virus identified as a probable causative agent of AIDS, with the expectation that the results of the test would be revealed to the Office of Victim-Witness Advocacy, which would in turn reveal the test results to the victim, is denied.
NOTES
[1] The complaint against J.G. was filed on July 13, 1994. The complaint against N.S. was filed on July 20, 1994. The complaint against J.T. was filed on October 18, 1994. J.G. pleaded guilty to aggravated sexual assault in violation of N.J.S.A. 2C:14-2a(1) on February 23, 1995. On January 20, 1995, N.S. pleaded guilty to aggravated sexual assault in violation of N.J.S.A. 2C:14-2a(1) and possession of CDS (five vials of cocaine) in violation of N.J.S.A. 2C:35-10. On January 18, 1995, J.T. pleaded guilty to aggravated sexual assault in violation of N.J.S.A. 2C:14-2a(1). Sentencing for all three juveniles is pending.
[2] The State made an oral application before the court on August 16, 1994. This application was immediately objected to by defense counsel. At the time, the motion only pertained to J.G. and N.S. It subsequently incorporated J.T. when a complaint against him was filed.
[3] N.J.S.A. 2C:43-2.2a provides: "In addition to any other disposition made pursuant to law, a court shall order a person convicted of, indicted for or formally charged with, or a juvenile charged with delinquency or adjudicated delinquent for an act which if committed by an adult would constitute, aggravated sexual assault or sexual assault ... to submit to an approved serological test for acquired immune deficiency syndrome (AIDS) or infection with the human immunodeficiency virus (HIV) or any other related virus identified as a probable causative agent of AIDS. The court shall issue such an order only upon the request of the victim and upon application of the prosecutor made at the time of indictment, charge, conviction or adjudication of delinquency." N.J.S.A. 2A:4A-43, adopted pursuant to L. 1993, c. 364 at the same time as N.J.S.A. 2C:43-2.2, amends the Code of Juvenile Justice and applies the mandatory testing specifically to juveniles.
[4] All parties consented to the appearance of the American Civil Liberties Union on October 5, 1994.
[5] The State stipulated Dr. Oleske's expertise with respect to testing, prevention and treatment, and diagnosis of HIV and AIDS. The court further incorporates Dr. Oleske's curriculum vitae and written report which were admitted into evidence.
[6] The court further incorporates Dr. Kloser's curriculum vitae and written report which were admitted into evidence.
[7] The court further incorporates Dr. Greenbaum's curriculum vitae and written report which were admitted into evidence.
[8] The State in its brief has cited the factual findings and alleged expert opinions found in Johnetta J. v. Municipal Court, 218 Cal. App.3d 1255, 267 Cal. Rptr. 666 (1990). These statements and factual findings are clearly hearsay and cannot be considered by this court. See N.J.Evid.R. 801, 804; Thompson v. Merrell Dow Pharm., 229 N.J. Super. 230, 551 A.2d 177 (App.Div. 1988).
[9] This opinion was also shared by Dr. Kloser.
[10] As testified to by Dr. Oleske:

[F]or example in hospital workers who are exposed to needle sticks from blood, and have an actual injection of blood into their system, there is a needle stick program in which AZT is started within 12 hours of that event and continued for six weeks. That has been characterized in the literature as a leap of faith with no basis for making that recommendation.
To take that further, I guess, and say that someone who may have been sexually exposed would benefit if started within 12 hours with AZT, is I think a further leap of faith based upon no evidence. (Emphasis added.)
[11] See n. 8.
[12] In fact, a gag order upon the victim, who is only a private citizen in this scenario, would most likely raise some serious First Amendment problems. Thus, a court ordered gag on the victim in these cases would probably not be an available method to save this statute.
[13] Although not decisive in this analysis, the court finds that convicted individuals also have a diminished expectation of privacy, having voluntarily decided to engage in criminal activity at the expense of their individual liberties.
[14] Again, for purposes of this analysis, the court has considered the diminished expectation of privacy enjoyed by convicted individuals. The court finds that they stand in the same Constitutional status, under Von Raab and Skinner, as employees of highly regulated industries, with a diminished but not extinguished zone of privacy.
[15] The State in its brief concedes that:

A positive test result for a sexual offender might mean suffering the "well-documented gauntlet of discrimination" facing HIV-infected persons. Matter of Juvenile A, B, C, D, E, supra, at 460.
[State's brief at 12.]