701 A.2d 1265

STATE OF NEW JERSEY IN THE INTEREST
OF J.G., N.S. AND J.T.

Argued January 6, 1997—Decided September 25, 1997.

568

*Ruth Bove Carlucci*, Assistant Deputy Public Defender, argued the cause for appellants J.G., N.S. and J.T. (*Susan L. Reisner*, Public Defender, attorney).

*Lisa Sarnoff Gochman*, Deputy Attorney General, argued the cause for respondent, State of New Jersey (*Peter Verniero*, Attorney General of New Jersey, attorney)

*John V. Jacobi* argued the cause for amicus curiae American Civil Liberties Union of New Jersey (*Crummy, Del Deo, Dolan, Griffinger & Vecchione*, attorneys; *Mr. Jacobi, Lenora M. Lapidus* and *Lawrence S. Lustberg*, on the brief).

*Linda E. Fisher*, a member of the Pennsylvania bar, submitted a brief on behalf of amici curiae The New Jersey Women & AIDS Network and The Legal Action Center (*Melville D. Miller, Jr.*, President, Legal Services of New Jersey, attorney).

The opinion of the court was delivered by

PORITZ, C.J.

Juveniles J.G., N.S. and J.T. challenge the constitutionality of *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1, which require sex

offenders,[1] upon a request by the victim, "to submit to ... approved serological test[s] for acquired immune deficiency syndrome (AIDS) or infection with the human immunodeficiency virus (HIV) or any other related virus identified as a probable causative agent of AIDS." *N.J.S.A.* 2C:43–2.2a. We granted certification to determine whether such involuntary testing violates rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Paragraphs 1 and 7, of the New Jersey Constitution. We hold that the challenged statutes do not impinge on an offender's federal or state constitutional rights provided that, before a court orders testing, it finds probable cause to believe that the accused or convicted sex offender has exposed the victim to a risk of possible HIV transmission.

I

*N.J.S.A.* 2C:43–2.2a requires a court to order serological testing, at a victim's request and on the prosecutor's application, of "a person convicted of, indicted for or formally charged with ... aggravated sexual assault or sexual assault as defined in subsection a. or c. of *N.J.S.* 2C:14–2." Similarly, *N.J.S.A.* 2A:4A–43.1 calls for testing, in accordance with *N.J.S.A.* 2C:43–2.2, of a juvenile charged with delinquency or adjudicated delinquent for an act that if committed by an adult would constitute aggravated sexual assault or sexual assault. In addition to an initial test, *N.J.S.A.* 2C:43–2.2a provides for repeat or confirmatory tests as medically necessary.

Serological tests so ordered must be carried out "as soon as practicable" by the Commissioner of the Department of Corrections, the Juvenile Justice Commission, a health care provider, or a licensed health facility. *N.J.S.A.* 2C:43–2.2b. Test results must be reported to the offender and to the Office of Victim–Witness

---

[1] Except as otherwise indicated, the terms "offender" and "assailant" will be used to refer to all persons, adults and juveniles, who are subject to testing under *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1.

Advocacy. *Ibid.* That office is charged with notifying the victim or making other arrangements for the victim to be notified of the test results. *N.J.S.A.* 2C:43–2.2e. The office must also "provide the victim with appropriate counseling, referral for counseling and if appropriate, referral for health care." *Ibid. N.J.S.A.* 2C:43–2.2f requires test results to be kept confidential, and specifically prohibits disclosure by the Department of Corrections, the Juvenile Justice Commission, the Office of Victim–Witness Advocacy, health care providers, and health care facilities or counseling services, except as authorized by the statute "or as otherwise authorized by law or court order." We observe that *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 were intended to comply with a federal law conditioning grant money on the enactment of such legislation. *See* Senate Judiciary Committee, *Statement to Assembly Bills No. 897 and No. 220, in N.J.S.A.* 52:4B–44.

## II

J.G., N.S., and J.T. were thirteen, fourteen, and fifteen years old, respectively, when they were charged in 1994 with juvenile delinquency for acts that would have constituted aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2a(1) if committed by an adult. They had forced a ten-year-old, mentally-retarded girl to engage in anal intercourse and fellatio. Each juvenile eventually pled guilty to the delinquency charges: J.T. on January 18, 1995; N.S. on January 20, 1995; and J.G. on February 23, 1995.

Following the filing of charges, the State moved at the request of the victim for orders compelling the juveniles to submit to tests for AIDS or HIV. The juveniles opposed the State's application on the ground that the testing statutes are unconstitutional, both facially and as applied to them. They asserted that the tests constitute an unreasonable search under the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution. They also contended that the statutes violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article I, Paragraph 1 of the

New Jersey Constitution because they do not provide sufficient procedural safeguards to protect the privacy rights of persons who have been accused but not convicted of sexual assault.

The Chancery Division held an evidentiary hearing at which the juveniles presented the testimony of three expert witnesses to support their claim that *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 are unconstitutional. The witnesses addressed the then-available HIV testing methodologies, medical diagnosis and treatment, and psychological counseling following possible exposure through sexual assault. The State did not present any witnesses.[2]

The Chancery Division made factual findings with respect to the detection and diagnosis of HIV. 283 *N.J.Super.* 32, 39–42, 660 *A.2d* 1274 (1995). Two tests are commonly used in combination to determine whether a person has been infected with HIV: the enzyme-linked immunosorbent assay (ELISA) test and the Western Blot test. If the ELISA test is positive then the Western Blot is performed to confirm the result. Both tests detect antibodies developed in response to the AIDS virus and do not detect the virus itself. The tests have high rates of "sensitivity" and "specificity," terms used to describe their accuracy in identifying those individuals who are HIV-positive and HIV-negative.[3] Generally,

---

[2] In its brief to the Chancery Division, the State cited expert opinions and factual findings from decisions of other jurisdictions on the constitutionality of various HIV and AIDS testing statutes. The Chancery Division did not discuss these cases in its decision. With respect to one case, *Johnetta J. v. Municipal Court,* 218 *Cal.App.*3d 1255, 267 *Cal.Rptr.* 666 (1990), the court found these statements to be inadmissible hearsay. 283 *N.J.Super.* 32, 39 n. 8, 660 *A.2d* 1274 (Ch.Div.1995).

[3] According to Steven Eisenstat, *An Analysis of the Rationality of Mandatory Testing for the HIV Antibody: Balancing the Governmental Public Health Interests with the Individual's Privacy Interest:*

The accuracy of the screening tests is measured by the percentage of infected people who actually test positive (sensitivity) and the percentage of uninfected individuals who actually test negative (specificity). The ELISA test is credited with a 99.7% sensitivity rate, and a 98.5% specificity rate.

however, it takes from three to six months from the date of infection to detect the body's immunological response. During this "window period" an infected person may have a negative test result. Despite this problem, the Chancery Division found that a combination of the ELISA and Western Blot tests is the most appropriate method for diagnosing HIV infection when there may have been exposure through a sexual assault. *Id.* at 42, 660 *A.*2d 1274.

The juveniles' experts testified about the value of the testing authorized by *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 in relation to the diagnosis, treatment, and counseling of sexual assault victims. In the opinion of Dr. James Oleske, testing sexual assailants for HIV would provide no medical benefit in the diagnosis or treatment of victims because the test would not reveal whether transmission, which does not occur in all cases, had in fact occurred, and because testing the assailant might produce a false-negative result due to the three- to six-month latency period. Dr. Oleske also testified that, although the drug azidothymidine ("AZT") has been administered to hospital workers following a confirmed injection of HIV-positive blood, this approach was not recommended in sexual assault cases based on its unproven utility and on negative side effects from AZT.

The experts offered their opinions about whether there was any "psycho-social benefit" to the victim in knowing the HIV status of the assailant. In Dr. Oleske's view, victims may suffer actual harm from knowing their assailants' status. They may wrongly rely on a false-negative result and discontinue medical care and testing, or they may react to a positive result without considering

The Western Blot, when used to confirm positive ELISA tests, has a 99.3% sensitivity rate and a 91.6% specificity rate.

[52 *U.Pitt.L.Rev.* 327, 332 (1991) (citation omitted).]

*See also* Robert J. Cordes & Michael E. Ryan, *Pitfalls in HIV Testing: Application and Limitations of Current Tests,* 98 *Postgraduate Medicine* 177 (1995) ("The sensitivity and specificity of currently licensed ELISA tests are greater than 98% and may approach 100%.").

their actual risk of infection or their own status. He acknowledged, however, that for the victim and the victim's family "[t]he question of peace of mind, ... in lay terms, may be real." Dr. Jill Greenbaum testified that victims would not find it psychologically helpful to know the HIV status of their assailants. In her view, such information would not aid in the counseling of victims, but rather, would tie sexual assault victims to the assailant at a time when victims need to focus on their own healing and on regaining control over their lives. She stated that knowing the assailant's HIV status does not "give you information about" the victim's status and that a false negative might lead the victim to forgo needed testing. Dr. Patricia Kloser likewise stated that testing assailants would not aid in diagnosing and treating the victim.

The Chancery Division found that "the involuntary taking of blood from a person charged with or convicted of aggravated sexual assault [constituted] ... a search within the meaning of the Fourth Amendment." 283 *N.J.Super.* at 55, 660 *A.*2d 1274. Applying the special needs test adopted by the United States Supreme Court in *Skinner v. Railway Labor Executives' Ass'n,* 489 *U.S.* 602, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639 (1989), and *National Treasury Employees Union v. Von Raab,* 489 *U.S.* 656, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685 (1989), the court determined that "[t]he state ha[d] a legitimate and compelling governmental interest in assisting and protecting the victims of sexual assault." 283 *N.J.Super.* at 55, 660 *A.*2d 1274. Because it could find no benefit to the victim, *id.* at 48–49, 660 *A.*2d 1274, the court concluded, however, that *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 are "unconstitutional as violative of the juveniles' rights under the Fourth and Fourteenth Amendments of the United States Constitution," *id.* at 55, 660 *A.*2d 1274.

The Appellate Division reversed. 289 *N.J.Super.* 575, 674 *A.*2d 625 (1996). The panel applied the *Skinner/Von Raab* special needs test to both the federal and state constitutional claims, but upheld the challenged statutes as applied to adjudicated juveniles and convicted adult sex offenders. Because understanding of

AIDS diagnosis and treatment continues to grow, and because new methods of treatment are constantly becoming available, the Appellate Division was especially reluctant to rule that "a legislative scheme of mandated testing is medically or psychologically useless to the victim or the treatment community." *Id.* at 591, 674 *A.*2d 625. The court concluded that, "[w]hen balanced, the individual defendant's interest in preventing a bodily intrusion and disclosure of his HIV status is significantly less weighty than the compelling state interest in the health and welfare of the victim in particular and the public in general." *Id.* at 592, 674 *A.*2d 625.

The Appellate Division remanded the case for the entry of an order requiring the juveniles to submit to the requested testing, which has since occurred. The panel did not consider the juveniles' argument that *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 violate the procedural due process guarantees of the Federal and State Constitutions by allowing a court to require testing of an accused offender prior to conviction or an adjudication of delinquency, noting that the juveniles had been adjudicated delinquent. 289 *N.J.Super.* at 593, 674 *A.*2d 625.

■ We granted certification, 146 *N.J.* 70, 679 *A.*2d 656 (1996), to address the constitutionality of *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1. Because the juveniles pled guilty after the trial court decision but before the Appellate Division opinion issued, their challenge to the testing of offenders who have been charged with or indicted for a sexual assault is technically moot. We recognize that, because of the time involved in the appellate process, many sexual assault cases will have reached a final disposition before an appellate court has the opportunity to rule on the issue whether HIV testing should have been permitted. In that this issue is "capable of repetition yet likely to evade review," we will consider it. *Brady v. Department of Personnel,* 149 *N.J.* 244, 253, 693 *A.*2d 466 (1997).

## III

Both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect

against unreasonable governmental searches and seizures. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.
>
> [*U.S. Const.* amend. IV.]

Article I, Paragraph 7 of the New Jersey Constitution, which is essentially identical, provides a separate state protection against unreasonable searches and seizures. *See State v. Pierce*, 136 *N.J.* 184, 208–09, 642 *A.*2d 947 (1994).

That the testing of blood for HIV is a search within the meaning of the Fourth Amendment and Article I, Paragraph 7 is uncontroverted. The State's brief acknowledges, "The requested blood test requiring physical penetration for removal of bodily fluid and subsequent chemical testing leading to the revelation of private medical information is, without argument, a search." *See Chandler v. Miller*, 520 *U.S.* ——, ——, 117 *S.Ct.* 1295, 1300, 137 *L.Ed.*2d 513, 522 (1997); *Skinner, supra*, 489 *U.S.* at 616–17, 109 *S.Ct.* at 1413, 103 *L.Ed.*2d at 659–60; *Schmerber v. California*, 384 *U.S.* 757, 767, 86 *S.Ct.* 1826, 1834, 16 *L.Ed.*2d 908, 918 (1966). Thus, we must determine whether that search is reasonable under the Fourth Amendment and Article I, Paragraph 7. *See Chandler, supra*, 520 *U.S.* at ——, 117 *S.Ct.* at 1300, 137 *L.Ed.*2d at 522.

Whether a search is reasonable under the Fourth Amendment " 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' " *Skinner, supra*, 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661 (quoting *United States v. Montoya de Hernandez*, 473 *U.S.* 531, 537, 105 *S.Ct.* 3304, 3308, 87 *L.Ed.*2d 381, 388 (1985)). A court must balance the encroachment on an individual's Fourth Amendment interests against the advancement of legitimate state goals. *Ibid.* When a search is conducted in furtherance of a criminal investigation, the balance is most often tipped "in favor of the procedures described by the Warrant Clause of the Fourth

Amendment," that is, toward a finding that the search "is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Ibid.*

An exception to the Warrant Clause may apply "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Ibid.* (internal quotations and citations omitted). Generally there must be some showing of individualized suspicion to conclude that a warrantless search is reasonable. In appropriate cases, however, even this requirement may be unnecessary where special needs are found. *Id.* at 624, 109 *S.Ct.* at 1417, 103 *L.Ed.*2d at 664. As stated in *Skinner:*

> In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.
>
> [*Id.* at 624, 109 *S.Ct.* at 1417, 103 *L.Ed.*2d at 664.]

Recently, the Supreme Court has used a special needs analysis in cases where body searches were not conducted to further a criminal investigation, but rather, were alleged to promote other important state interests. *See Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1295, 137 *L.Ed.*2d at 513 (applying special needs analysis to Georgia statute requiring drug tests of candidates for state office); *Vernonia School Dist. 47J v. Acton,* 515 *U.S.* 646, 115 *S.Ct.* 2386, 132 *L.Ed.*2d 564 (1995) (applying special needs analysis to requirement that student athletes be tested for drug use); *Von Raab, supra,* 489 *U.S.* at 656, 109 *S.Ct.* at 1384, 103 *L.Ed.*2d at 685 (applying special needs analysis to United States Customs Service employee drug testing program); *Skinner, supra,* 489 *U.S.* at 602, 109 *S.Ct.* at 1402, 103 *L.Ed.*2d at 639 (applying special needs analysis to Federal Railroad Administration employee drug testing program); *see also Stigile v. Clinton,* 110 *F.*3d 801 (D.C.Cir.1997) (applying special needs analysis to Office of Management and Budget's random drug testing program); *Tanks v. Greater Cleveland Reg'l Transit Auth.,* 930 *F.*2d 475 (6th Cir.1991) (applying special needs analysis to suspicionless

drug testing of bus driver); *Transport Workers' Union of Philadelphia, Local 234 v. SEPTA,* 884 *F*.2d 709 (3d Cir.1989) (applying special needs analysis to SEPTA's drug testing program).

In *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.,* 151 *N.J.* 531, 701 *A*.2d 1248 (1997), also decided today, we approved the use of this approach in determining the reasonableness of a search involving random drug testing of New Jersey Transit police officers under Article I, Paragraph 7 of our State Constitution. The random drug testing required in *New Jersey Transit* is conducted for public safety reasons, not for the purposes of a criminal investigation. We held that requiring a warrant based on probable cause, or even individualized suspicion of drug use, would be "impracticable" in the circumstances of *New Jersey Transit.* Applying the special needs analysis, we determined that the search is reasonable. *Id.* at 558–565, 701 *A*.2d at 1261–1265.

Federal precedent requires that we use a special needs analysis to determine whether the testing provisions of *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 violate the Fourth Amendment of the United States Constitution. We are persuaded that the requirements of Article I, Paragraph 7 of the New Jersey Constitution are met by this approach. *New Jersey Transit, supra,* 151 *N.J.* at 556, 701 *A*.2d at 1260; *see O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 242–43, 624 *A*.2d 578 (1993) (discussing *Skinner/Von Raab* approach to constitutional adjudication under both Fourth Amendment and Article I, Paragraph 7 of New Jersey Constitution). We therefore turn to the question whether HIV testing of accused or convicted sex offenders "ranks among the limited circumstances in which suspicionless searches are warranted." *Chandler, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1298, 137 *L.Ed.*2d at 519.

Serological testing of sex offenders pursuant to *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 is not intended to facilitate the criminal prosecution of those offenders. HIV test results are required to be kept confidential (with certain limited exceptions,

see *infra* at 587–588, 701 *A*.2d at 1276). *N.J.S.A.* 2C:43–2.2f. Notably, the statute does not authorize disclosure to the prosecutor's office. The State has said that the tests are not intended to be used to gain evidence for criminal prosecutions and do not place offenders at risk of a new conviction or longer sentence. We agree, and hold that the results of HIV tests authorized by *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 may not be used against an accused sex offender in a criminal prosecution.

Moreover, both the warrant and individualized suspicion requirements are impractical in this context, as in *New Jersey Transit.* "HIV infected sexual offenders often have no outward manifestations of infection," which means that probable cause or individualized suspicion that an assailant is infected with the AIDS virus could not be found without testing. *In re Juveniles A, B, C, D, E,* 121 *Wash.*2d 80, 847 *P*.2d 455, 459 (1993); *see also State v. Superior Court,* 187 *Ariz.* 411, 930 *P*.2d 488, 492 (App.1996) (stating that requirement of probable cause that offender is infected with HIV "would defeat the [testing] statute's purpose, given the hidden nature of HIV"). Requiring probable cause or individualized suspicion before testing could be conducted would create the proverbial Catch–22 and would "frustrate the governmental purpose behind the search." *Skinner, supra,* 489 *U.S.* at 623, 109 *S.Ct.* at 1416, 103 *L.Ed.*2d at 663 (internal quotation marks omitted) (citation omitted). These circumstances demonstrate a special need requiring the Court to "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* at ——, 117 *S.Ct.* at 1301, 137 *L.Ed.*2d at 523.

IV

The private interests at stake in this case are apparent. Although blood sampling may be a relatively routine medical

procedure to which most people are accustomed,[4] *Schmerber,
supra,* 384 *U.S.* at 771, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920, the
subsequent HIV analysis and nonconsensual disclosure is a fur-
ther, more intrusive invasion. *See Skinner, supra,* 489 *U.S.* at
616, 109 *S.Ct.* at 1413, 103 *L.Ed.*2d at 659 (stating that in addition
to initial physical intrusion, "[t]he ensuing chemical analysis of the
sample to obtain physiological data is a further invasion of the
tested [individual's] privacy interests"); *see also* Lawrence O.
Gostin et al., *HIV Testing, Counseling, and Prophylaxis After
Sexual Assault,* 271 *JAMA* 1436, 1443 (1994) ("The personal
interest of the accused is not merely the drawing of blood without
consent, but the intimate information obtained that could result in
a deep invasion of privacy and discrimination."). Mandatory
testing and disclosure of HIV status thus threaten privacy inter-
ests beyond the taking of the blood sample, particularly because of
the social stigma, harassment, and discrimination often suffered
by individuals who have AIDS or who are HIV-positive. As the
Third Circuit recently observed, "there still exists a risk of much
harm from non-consensual dissemination of the information that
an individual is inflicted with AIDS." *Doe v. SEPTA,* 72 *F.*3d 1133,
1140 (3d Cir.1995), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 51, 136
*L.Ed.*2d 15 (1996); *see also Doe v. Borough of Barrington,* 729
*F.Supp.* 376, 384 (D.N.J.1990) ("[T]he privacy interest in one's
exposure to the AIDS virus is even greater than one's privacy
interest in ordinary medical records because of the stigma that
attaches with the disease.").

---

[4] The recent development of orally-administered tests for HIV antibodies
suggests that the extraction of blood to test for HIV may not be necessary in the
future. *See* Joseph Dee, *N.J. Plans Switch to Oral AIDS Testing, Trenton Times,*
May 8, 1997, at A1. However, an oral test would also be a search within the
scope of the Fourth Amendment, albeit a somewhat less intrusive search. *See
Skinner, supra,* 489 *U.S.* at 616–17, 109 *S.Ct.* at 1413, 103 *L.Ed.*2d at 659 (noting
that breathalyzer test raises Fourth Amendment "concerns about bodily integri-
ty" similar to those raised by blood test). This new development does not affect
our analysis.

Against the offender's privacy interest, we must balance the governmental interest in conducting the search. That interest "must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler, supra*, 520 *U.S.* at ——, 117 *S.Ct.* at 1303, 137 *L.Ed.*2d at 526. The statutes themselves contain no legislative findings. The State asserts that *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 further the rights of victims by granting them access to critical medical information about their assailants' HIV or AIDS status when the victims determine that the information is in their best interest. The statutes, the State claims, reflect the Legislature's concern for the physical and emotional needs of victims of sexual assault.

Unquestionably, the state has a compelling interest in making information available when it directly affects the physical and mental well-being of survivors of sexual assault. Although the needs of crime victims have long been a particular concern of government, in recent years, at both the federal and state level, there has been a heightened awareness of victims' rights. Thus, Congress has passed laws designed to protect victims' rights, including, among others, the Victims of Crime Act of 1984, *Pub.L. No.* 98–473, 98 *Stat.* 2170 (1984) (codified in part at 42 *U.S.C.A.* §§ 10601 to 10605) (establishing Crime Victims' Fund to provide funding for state victim compensation programs); the Victims' Rights and Restitution Act of 1990, 42 *U.S.C.A.* §§ 10606 to 10607 (providing victims right to be treated fairly, to be protected from accused offender, to be notified and present at all court proceedings related to offense, and to be informed about conviction, sentencing, imprisonment and release of offender); and the Civil Rights Remedies for Gender–Motivated Violence Act, 42 *U.S.C.A.* § 13981, included in the Violence Against Women Act of 1994, *Pub.L. No.* 103–322, 108 *Stat.* 1902 (1994) (providing civil rights cause of action to victims of gender-motivated violence). Likewise, in 1985, 1987, and 1995, the New Jersey Legislature enacted three statutes providing for the protection of victims: the Crime

Victim's Bill of Rights, *N.J.S.A.* 52:4B–34 to –38 (granting rights to crime victims, including right to be treated with dignity, to be informed about criminal justice process, and to be told about available remedies and social services; later amended to allow victim impact statements at sentencing); the Victim/Counselor Privilege Act, *N.J.S.A.* 2A:84A–22.13 to –22.15 (enacting *N.J.R.E.* 517) (extending testimonial privilege to contents of communications between victim and counselor); and the victim impact statute, *N.J.S.A.* 2C:11–3c(6) (allowing victim impact statements in capital cases). *See State v. Muhammad,* 145 *N.J.* 23, 32–33, 678 *A.*2d 164 (1996).

In 1991, voters approved the Victim's Rights Amendment to the State Constitution. *N.J. Const.* art. 1, Paragraph 22. Article 1, Paragraph 22 provides that "[a] victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system" and "shall be entitled to those rights and remedies as may be provided by the Legislature." This provision "explicitly authorizes the Legislature to provide victims with 'those rights and remedies' that are deemed appropriate to effectuate the purpose of [the] amendment." *Muhammad, supra,* 145 *N.J.* at 34, 678 *A.*2d 164. A majority of states have also recently amended their constitutions to include provisions to protect the rights of victims. *See* Chief Justice Richard Barajas & Scott Alexander Nelson, *The Proposed Crime Victims' Federal Constitutional Amendment: Working Toward a Proper Balance,* 49 *Baylor L.Rev.* 1 (1997) (discussing state constitutional amendments to protect victims' rights and proposed federal victims' rights constitutional amendment).

Survivors of sexual assault constitute a significant class of victims whose unique needs have been acknowledged. The United States Department of Justice reports that there were 162,670 rapes of females and 4,890 rapes of males aged 12 years and over in 1994. *Bureau of Justice Statistics, U.S. Dept. of Justice, Criminal Victimization in the United States 1994* 7 (1997). Also in 1994, there were 106,370 sexual assaults of females and 10,220

sexual assaults of males aged 12 years and over. *Id.* Survivors of sexual assault, and those close to them, face significant psychological as well as physical trauma. *See id.* at 1437 ("The chronic psychological effects of sexual assault initially were described as the rape trauma syndrome and now are accepted as a special example of posttraumatic stress disorder."); *Collins v. Union County Jail,* 150 *N.J.* 407, 422–23, 696 *A.2d* 625 (1997) ("The Legislature explicitly recognized[,] ... when it enacted the Victim/Counselor Privilege Act[,] ... that the psychological and emotional injuries of rape 'are often more serious than the physical injuries suffered.'") (quoting *N.J.S.A.* 2A:84A–22.13a; *N.J.R.E.* 517). *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 respond to these significant concerns by requiring the testing of offenders at the victim's request, and by establishing counseling, testing, and other support services for victims.

█ The juveniles do not deny that the state has a substantial interest in passing legislation to assist victims of crime. Nor do they contest that that is the purpose of *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1. Rather, they argue primarily that the legislation does not further the legitimate goal of victim assistance because the expert testimony presented to the trial court established that there would be no benefit to the victim from the disclosure of an assailant's HIV status. Therefore, say the juveniles, the balance must be struck in favor of protecting an assailant's privacy interest in non-disclosure.

At trial, the experts produced by the juveniles were unanimous in their opinion that there would be no medical benefit to the victim, in either treatment or diagnosis, from testing the accused or convicted offender. In their view, the only appropriate course is for the victim to undergo HIV testing. They emphasized that testing offenders will not reveal definitively whether they are HIV-positive since the three- to six-month latency period might produce false-negative results. Even if an offender does test positive, the test will not reveal whether transmission to the victim

has occurred because transmission does not occur in all cases.[5] The experts also stated that no recommended treatments are available for victims who believe they may have been infected but have not yet themselves tested positive for HIV.

The State failed to present any witnesses to rebut the juveniles' experts. We must presume, however, that the Legislature was aware of medical and scientific information about AIDS transmission, detection, treatment and counseling, and of case law relying on that information. *See Virgin Islands v. Roberts*, 756 *F.Supp.* 898, 899–900 (D.V.I.1991); *Johnetta J. v. Municipal Court*, 218 *Cal.App.*3d 1255, 267 *Cal.Rptr.* 666, 670–74 (Ct.App.1 Dist.1990). Whether due to the rapidly-evolving nature of AIDS diagnosis and treatment or for other reasons, the near unanimity expressed in the testimony of the juveniles' witnesses does not reflect the diversity of opinion in the medical community. Although Dr. Oleske testified that no medical treatments were available for sexual assault victims who feared infection, post-exposure treatment is now offered to rape survivors and others. *See* Abigail Zuger, *"Morning After" Treatment for AIDS*, N.Y. Times, June 10, 1997, at C1. Although a test of the assailant will not definitively reveal the status of the victim, other medical authorities note that such information may be useful to the victim:

Victim service professionals face significant dilemmas when addressing prophylaxis. Introduction of information about an unsubstantiated prevention of an already small risk may create both added anxiety and unsubstantiated hope. The cost of [treatment] may make prophylaxis unaffordable for many survivors who might otherwise choose it. These dilemmas should be resolved in favor of respecting the survivor's right to evaluate the information and make a decision.

. . . .

Despite ... significant limitations, preconviction testing with full procedural protections could alter the survivor's course of prophylactic antiviral therapy. The

---

[5] The risk of HIV transmission in sexual assault cases involving a transfer of bodily fluids has been conservatively estimated to be at least two per 1,000 contacts, with a two per 100 contact risk in certain cases and an even greater risk "if other factors were present, such as violence producing trauma and blood exposure or the presence of inflammatory or ulcerative [sexually transmitted diseases]." Gostin, *supra*, 271 *JAMA* at 1437.

survivor could begin antiviral therapy as soon after the assault as possible. If, subsequently, the survivor learns that the accused has tested negative, he or she could discontinue the prophylaxis and avoid the potential side effects of continued treatment with antiviral drugs. Even though the survivor could not rely on a single negative test result to completely eliminate the risk of a false-negative result, this might provide substantial relief to survivors who experienced serious side effects.

[Gostin, *supra*, 271 *JAMA* at 1439, 1441.]

See also Roberts, *supra*, 756 *F.Supp.* at 903 (observing that "[t]he status of the potential source is also an 'important factor' in deciding whether a patient should subject herself to experimental prophylactic courses of treatment, such as the pre-seropositive intake of azidothymidine (AZT)"); *Johnetta J., supra*, 267 *Cal. Rptr.* at 672–73 (quoting testimony of Chief of Staff at San Francisco General Hospital that an assailant's negative HIV test "informs the patient that the risk of infection is decreased, ... assists the physician's ability to assess the risk of infection, which will affect the degree of monitoring and other precautions, ... [and] assists the physician in diagnosing and understanding the causes of medical problems that may arise.").

Also relevant is a notice from an interagency working group comprised of representatives from the Centers for Disease Control and Prevention ("CDC"), the Food and Drug Administration, the Health Resources and Services Administration and the National Institutes of Health. CDC, *Update: Provisional Public Health Service Recommendations for Chemoprophylaxis After Occupational Exposure to HIV*, 45 *Morbidity & Mortality Wkly. Rep.* 468 (1996). The notice contains a provisional recommendation for the use of zidovudine ("ZDV") and other antiretroviral drugs based on new studies indicating a reduced risk of HIV infection in health care workers treated with ZDV. *Id.* at 470–71. In questions and answers compiled in connection with the notice, the CDC recommends consultation with "a local expert" about the use of antiretroviral drugs for post-exposure treatment when there has been non-occupational exposure such as sexual assault. CDC, National AIDS Clearing House, *Questions and Answers for Update: Provisional Public Health Service Recommendations for*

*Chemoprophylaxis After Occupational Exposure to HIV* 2 (June 7, 1996). Such recommendations argue, at the very least, for as much information as can be obtained about an assailant's status. Based on that information and discussions with their physicians, victims can balance the pros and cons of treatment and make critical health care decisions.

We find particularly unpersuasive Dr. Greenbaum's rejection of any psychological benefit to the victim. Dr. Greenbaum testified that the victim would not be aided and might even be psychologically harmed by disclosure of the HIV status of the offender. Dr. Oleske, on the other hand, acknowledged that "[t]he question of peace of mind [to the victim and the victim's family] . . . in lay terms, may be real," although he concluded that medically it did not make sense to test the assailant.

Other medical authorities believe the psychological benefits to the victim from testing the assailant to be significant, and confirm that the victim's desire to know the assailant's HIV status is not irrational:

> The strongest case for imposed preconviction testing rests on the psychological benefits it may offer the survivor. The psychological well-being of the survivor of sexual assault is a crucial part of his or her overall health. The psychological harm from sexual assault includes not only the trauma of the original assault, but also the rational fear of HIV infection. Moreover, the burden of anxiety persists for a substantial period of time. Without testing the accused, the survivor cannot rely on his or her infection status for 6 to 12 months after the assault.
>
> Policies authorizing early testing of the accused could help relieve this concern in many cases. Even given the small possibility of false-positive and false-negative test results, the news would provide substantial reassurance to the survivor. Of course, where testing reveals that the accused is infected, the survivor could experience additional psychological stress. This burden, while heavy, would fall on far fewer survivors than those who currently worry about infection. Knowledge of exposure might even allow survivors to begin psychological preparation for the results of their own testing. In those cases of sexual assault where the accused is apprehended relatively soon after the assault, involuntary testing, with appropriate due process and confidentiality protections for the accused, could mitigate one of the primary ongoing harms of the assault, the survivor's fear and uncertainty about the risk of contracting HIV.

[Gostin, *supra*, 271 *JAMA* at 1442.]

Clearly, a diversity of views exists within the medical community. Also, as the authorities indicate, our knowledge about AIDS treatment and diagnosis is constantly evolving. We agree with the Appellate Division that, in these circumstances, a court should be "hesitant to dismiss a victim's desire to know the HIV status of his/her assailant." 289 *N.J.Super.* at 588, 674 *A.*2d 625.

We observe that procedural protections ensure that the offender's privacy interests are not unduly infringed. Test results may not be used against accused offenders in criminal proceedings. *See supra* at 578–579, 701 *A.*2d at 1271–1272. Testing of the assailant is required only when a victim—not a victim's family, or counselor, or anyone else—decides that knowing the HIV status of the assailant is beneficial and requests the test. *N.J.S.A.* 2C:43–2.2a. The test result is disclosed only to the victim, the assailant, and the Office of Victim–Witness Advocacy; the latter is barred from disclosing the result other than as authorized by the statute or court order. *N.J.S.A.* 2C:43–2.2b, –2.2e, –2.2f. Only in the case of a minor should it be inferred that a parent or guardian can request testing and obtain the results. The statute explicitly states that "[t]he result of a test … shall be confidential." *N.J.S.A.* 2C:43–2.2f. We read this provision to place reasonable restrictions on public dissemination of the offender's HIV status by the victim.

The federal statute authorizing HIV testing of convicted sexual assailants provides specific restrictions on disclosure that can serve as a useful guide in interpreting *N.J.S.A.* 2C:43–2.2f. 42 *U.S.C.A.* § 14011(b)(5) states:

> The victim may disclose the test results only to any medical professional, counselor, family member or sexual partner(s) the victim may have had since the attack. Any such individual to whom the test results are disclosed by the victim shall maintain the confidentiality of such information.

The Court will not assume that persons who are told of the assailant's HIV status "will violate the intent of [the testing statutes] by giving notification far beyond that which is authorized." *Doe v. Poritz,* 142 *N.J.* 1, 110, 662 *A.*2d 367 (1995).

The procedural protections of the testing statutes limit the intrusion on an assailant's privacy interest and are significant in our analysis. Balancing the potential psychological and medical benefits to the victim from disclosure of the assailant's HIV status against the assailant's interest in non-disclosure, we find that the assailant's privacy interests are outweighed by the benefits to a victim who requests serological testing. Testing and disclosure of an assailant's status can provide information that is helpful to victims of sexual assault. The dissemination of test results, moreover, is carefully restricted. It is, therefore, reasonable to require assailants to submit to this intrusion upon their privacy.

V

Our discussion of the state's interest in assisting sexual assault victims is predicated on the possibility of transmission of the AIDS virus during the assault. *See In re Juveniles, supra,* 847 *P.*2d at 466 (Utter, J., concurring in part, dissenting in part) (stating "[w]hen there is no possibility of infection, the State's interest in protecting the victim of a sexual offender from AIDS is no greater than its interest in protecting the victim of a mugger or an automobile thief whose offense poses no possibility of HIV infection"); *see also Glover v. Eastern Neb. Community Office of Retardation,* 867 *F.*2d 461, 464 (8th Cir.), *cert. denied,* 493 *U.S.* 932, 110 *S.Ct.* 321, 107 *L.Ed.*2d 311 (1989) (holding that administrative agency's interest in HIV testing of employees who work with mentally retarded persons was not justified "[b]ecause the risk of disease transmission has been shown to be negligible" in circumstances of employment). It has been conclusively established that transmission of HIV occurs only when bodily fluids, such as blood, semen, or vaginal secretions of a person infected with HIV come into contact with the blood or mucous membranes of another person. Helena Brett–Smith & Gerald H. Friedland, *Transmission and Treatment, in AIDS Law Today: A New Guide for the Public* 23 (Scott Burris et al. eds., 2d ed.1993). Although sexual contact is one of the primary means of HIV

infection, *id.* at 24–25, there can be no possibility of HIV transmission from an assault where there has been no transfer or potential transfer of bodily fluids. The state would have no interest in performing HIV tests in such a case. *Cf. Glover, supra,* 867 *F.*2d at 463.

Neither *N.J.S.A.* 2C:43–2.2 nor *N.J.S.A.* 2A:4A–43.1 provides sufficient procedural safeguards to ensure that HIV testing of accused and convicted sex offenders occurs only when the state's interest in testing is present. The statutes require the testing of adults "convicted of, indicted for or formally charged with ... aggravated sexual assault or sexual assault as defined in subsection a. or c. of *N.J.S.* 2C:14-2," *N.J.S.A.* 2C:43–2.2a, and of juveniles "charged with delinquency or adjudicated delinquent" for acts which constitute the same crimes. *N.J.S.A.* 2A:4A–43.1. Pursuant to *N.J.S.A.* 2C:14–2a and –2c, a person is guilty of aggravated sexual assault or sexual assault if he or she "commits an act of sexual penetration with another person" in specifically enumerated circumstances. "Sexual penetration" is defined as "vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or the insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction." *N.J.S.A.* 2C:14–1c. Because "sexual penetration" is not limited to acts where there is a possibility of transfer of bodily fluids, *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 could require HIV testing when there is no risk of HIV transmission.

Twenty-one states and the federal government require a showing of a risk of HIV transmission before HIV testing of either accused or convicted sex offenders will be ordered. *See, e.g.,* 42 *U.S.C.* § 14011(b)(2)(C) (requiring determination that risk of transmission of HIV occurred); *Ind.Code Ann.* § 35–38–1–10.5(a)(1) (same); *Neb.Rev.Stat.* § 29–2290(1) (same); *Ariz.Rev. Stat.Ann.* § 13–1415(B) (requiring finding of "significant exposure" to assailant's bodily fluids); *Iowa Code Ann.* § 709B.2 (same); *Fla.Stat.Ann.* § 960.003(2) (ordering testing when assailant has been charged with offense involving transmission of bodily

fluids); *Idaho Code* § 39–604(4) (same); *Cal.Health & Safety Code* § 121055 (requiring probable cause to believe risk of HIV transmission has occurred before testing may be ordered); *Ga.Code Ann.* § 17–10–15 (same); *Md.Ann.Code* art. 27, § 855 (same); *N.C.Gen.Stat.* § 15A–534.3 (same); *N.D.Cent.Code* § 23–07.7–01 (same); *S.D.Codified Laws* § 23A–35B–3 (same); *Wis.Stat.Ann.* § 968.38 (same). In New Jersey, statutes that provide for HIV testing of adult or juvenile non-sex offenders allow such testing only if

> (1) in the course of the commission of the offense, including the immediate flight thereafter or during any investigation or arrest related to that offense, a law enforcement officer, the victim or other person suffered a prick from a hypodermic needle, provided there is probable cause to believe that the defendant is an intravenous user of controlled dangerous substances; or
>
> (2) in the course of the commission of the offense, including the immediate flight thereafter or during any investigation or arrest related to that offense, a law enforcement officer, the victim or other person had contact with the defendant which involved or was likely to involve the transmission of bodily fluids.
>
> [*N.J.S.A.* 2C:43–2.3a; *see N.J.S.A.* 2A:4A–43.4.]

We hold that a showing that there has been a possible transfer of bodily fluids from the accused or convicted offender to the victim, and thus a demonstration of a risk that the AIDS virus may have been transmitted from the offender to the victim, is required before a court can order the HIV testing of the offender. Only if such a showing is made will the interests of the state in enacting the testing statutes outweigh the privacy interests of the offender. On such a showing, the testing statutes will "bear[ ] a close and substantial relation" to those state interests. *See Von Raab, supra,* 489 *U.S.* at 676, 109 *S.Ct.* at 1396, 103 *L.Ed.*2d at 709.

In determining whether there has been a possible transfer, a court must ensure that the state's purpose in performing the testing is not frustrated, *see Skinner,* 489 *U.S.* at 623, 109 *S.Ct.* at 1416, 103 *L.Ed.*2d at 663, and that the accused or convicted offender's privacy interests are adequately protected. We expect that by requiring probable cause to believe there is a possibility that HIV transmission has occurred, the interests of the state and

the interests of the offender will be protected. Probable cause is essentially "a well-grounded suspicion or belief." *State v. DeSimone*, 60 *N.J.* 319, 322, 288 *A.*2d 849 (1972). Under the Fourth Amendment, before an individual may be arrested for a crime, there must be a finding of probable cause "that an offense is taking [or has taken] place and the individual is party to it," *ibid.*, by either the arresting officers for a warrantless arrest, *Beck v. Ohio*, 379 *U.S.* 89, 91, 85 *S.Ct.* 223, 225, 13 *L.Ed.*2d 142, 145 (1964), or by a "neutral and detached magistrate" for issuance of an arrest warrant, *Gerstein v. Pugh*, 420 *U.S.* 103, 112, 95 *S.Ct.* 854, 862, 43 *L.Ed.*2d 54, 64 (1975). Probable cause is not a stringent standard, but does require "something more than a raw, unsupported suspicion." *State ex rel. A.J.*, 232 *N.J.Super.* 274, 286, 556 *A.*2d 1283 (App.Div.1989).

Courts upholding HIV testing of sex offenders or other criminal defendants have based their decisions at least in part on the existence of probable cause to believe that there had been a possible transmission of bodily fluids from the offender to the victim. *See Roberts, supra,* 756 *F.Supp.* at 901 (finding of probable cause to believe defendant had raped victim resulted in finding of probable cause to believe that defendant had exposed victim "to his sexual fluids—a known method of HIV transmission"); *Johnetta J., supra,* 267 *Cal.Rptr.* at 669 (upholding constitutionality of statute allowing HIV testing "[i]f the court finds that probable cause exists to believe that a possible transfer of blood, saliva, semen or other bodily fluid took place between the defendant" and the victim); *People v. J.G.,* 171 *Misc.*2d 440, 655 *N.Y.S.*2d 783, 787 (Sup.Ct.1996) (upholding constitutionality of statute allowing HIV test at request of " 'victim,' " defined as "the 'person with whom the defendant engaged in an act of sexual intercourse or deviate sexual intercourse' "); *People v. Doe,* 169 *Misc.*2d 29, 642 *N.Y.S.*2d 996, 1000 (Co.Ct.1996) (same); *State v. Parr,* 182 *Wis.*2d 349, 513 *N.W.*2d 647, 652 (App.1994) (ordering HIV test of defendant based on victim's account and physical evidence that satisfied statutory requirement of " 'probable cause to believe that the defendant has significantly exposed the victim' " to the risk of HIV transmission).

We agree. Before a court may order HIV testing of sex offenders pursuant to *N.J.S.A.* 2C:43–2.2 or *N.J.S.A.* 2A:4A–43.1, the court must find that probable cause exists to believe that the victim may have been exposed to the bodily fluids of the assailant such that there is a possibility of transmission of the AIDS virus. If the court makes such a finding, the testing authorized by *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1 will comport with the requirements of both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution.

Evidence sufficient to support a finding of probable cause can be gleaned from numerous sources, including sworn statements of the victim, the offender, law enforcement officers or other witnesses, the evidence presented in seeking an arrest warrant for the offender, the findings of the judicial officer who determined that there was probable cause to issue the arrest warrant, the evidence presented at a probable cause hearing held pursuant to *Rule* 3:4–3, testimony before the grand jury, the indictment returned against the offender by the grand jury, and any evidence presented at the trial of the offender for the alleged sexual assault against the victim. We anticipate that in most cases, an order requiring testing will issue forthwith upon an application from the prosecutor on notice to the offender.

■ If the evidence is not sufficient, the court may, in its discretion, hold a hearing to afford the State the opportunity to demonstrate that probable cause exists. The hearing should be similar to a preliminary hearing under *Rule* 3:4–3 in that both the offender and the State must be given notice, the offender may cross-examine witnesses offered by the State, the rules of evidence shall not apply, *see State ex rel. B.T.,* 145 *N.J.Super.* 268, 273, 367 *A.*2d 887 (App.Div.1976), *certif. denied,* 73 *N.J.* 49, 372 *A.*2d 314 (1977) and the offender shall be entitled to counsel, *Coleman v. Alabama,* 399 *U.S.* 1, 9–10, 90 *S.Ct.* 1999, 2003, 26 *L.Ed.*2d 387, 396–97 (1970); *State v. Tucker,* 137 *N.J.* 259, 273–74, 645 *A.*2d 111 (1994); *State v. Sanchez,* 129 *N.J.* 261, 265, 609 *A.*2d 400 (1992).

In view of the importance of the state's interest in communicating information to the victim in a timely manner, the determination of whether probable cause exists should be made as soon as possible in a case requiring a hearing. The hearing should not become a discovery device and should be limited in scope to the issues relevant to AIDS testing.

## VI

Finally, we consider the juveniles' due process claims. The Due Process Clause of the Fourteenth Amendment prohibits the deprivation "of life, liberty, or property, without due process of law." *U.S. Const.* amend. XIV, § 1. Similarly, Article I, Paragraph 1 of the New Jersey Constitution "protects against injustice and, to that extent, protects 'values like those encompassed by the principle[ ] of due process.' " *Doe v. Poritz, supra,* 142 *N.J.* at 99, 662 *A.*2d 367 (alteration in original) (quoting *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985)). The juveniles assert that the testing statutes violate due process because they do not provide procedural safeguards sufficient to protect the fundamental privacy rights and liberty interests of accused sex offenders who have not been adjudicated delinquent or convicted of any crime. The juveniles contend that due process mandates a hearing to establish probable cause to believe that the accused committed the sexual assault and that the victim was exposed to the assailant's bodily fluids. As to the latter claim, because we have required a showing of probable cause that the AIDS virus could have been transmitted to the victim during the sexual assault, we find no due process violation.

As to the juveniles' claim that the testing statutes lack safeguards to protect the privacy and liberty interests of accused sex offenders, we also find no due process violation. For an offender to be subject to a mandatory HIV test under *N.J.S.A.* 2C:43–2.2 or *N.J.S.A.* 2A:4A–43.1, a showing of at least probable cause that he or she committed the charged assault must have been made. To sustain a conviction for sexual assault, the State must prove

beyond a reasonable doubt that the defendant committed each element of the offense. *See In re Winship*, 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1072–73, 25 *L.Ed.*2d 368, 375 (1970). That showing also is required before a juvenile may be adjudicated delinquent. *See id.* at 367–68, 90 *S.Ct.* at 1074–75, 25 *L.Ed.*2d at 377–78. The return of an indictment against a defendant for sexual assault necessitates a finding by the grand jury that the State has made out a *prima facie* case that the defendant committed the offense. *See Trap Rock Indus. v. Kohl*, 59 *N.J.* 471, 487–88, 284 *A.*2d 161 (1971), *cert. denied*, 405 *U.S.* 1065, 92 *S.Ct.* 1500, 31 *L.Ed.*2d 796 (1972). A similar finding is required before a defendant may be formally charged and tried on an accusation, after waiving his or her right to an indictment. *See Rule* 3:7–2, 3:7–3; *State v. McDonald*, 50 *N.J.Super.* 1, 7–8, 141 *A.*2d 124 (App.Div.1958), *aff'd*, 30 *N.J.* 126, 152 *A.*2d 143, *cert. denied*, 361 *U.S.* 849, 80 *S.Ct.* 107, 4 *L.Ed.*2d 88 (1959). In the case of a juvenile charged with delinquency, a summons may not issue on that charge without a finding of probable cause to believe that the juvenile is delinquent. *Rule* 5:20–2. In addition, a probable cause hearing is required when a juvenile has been charged with delinquency and has been placed in detention. *N.J.S.A.* 2A:4A–38i. In each instance, the showing that the juveniles seek is required before testing can be ordered and the juveniles' due process rights are adequately protected.

## VII

The judgment of the Appellate Division is affirmed insofar as it sustained the constitutionality of the testing statutes as applied to the juveniles. The judgment is modified insofar as we require that, before testing may be ordered, a court must find probable cause to believe that the victim has been exposed to a risk that transmission of the AIDS virus may have occurred. If this finding is made, the state has a compelling interest in testing offenders. We emphasize that the results of a required HIV test may not be used against an offender in a criminal proceeding, and that the

confidentiality requirements of the statutes reasonably limit the public dissemination of an offender's HIV status.

As modified, the judgment of the Appellate Division is affirmed.

Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN join in Chief Justice PORITZ's opinion.

*For modification and affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.