**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4097-14T3

MARILYN VELEZ,

    Plaintiff-Respondent,

v.

ROCKTENN COMPANY and RAYMOND
PERRY,

    Defendants-Appellants.

_____

Argued April 5, 2017 — Decided July 30, 2018

Judges Fuentes, Simonelli, and Gooden Brown.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Docket No.
L-1228-12.

John E. MacDonald argued the cause for
appellants (Constangy, Brooks, Smith &
Prophete, LLP, attorneys; John E. MacDonald,
on the brief).

Luis Hansen argued the cause for respondent
(Hyderally & Associates, PC, attorneys; Ty
Hyderally and Luis Hansen, on the briefs).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

After she was terminated, plaintiff filed a four-count complaint against her employer, defendant Rocktenn Company, and her supervisor, defendant Raymond Perry, alleging, among other things, hostile work environment sexual harassment (count two) and retaliation (count three), in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Following denial of defendants' motions for summary judgment[1] and a directed verdict,[2] the trial court submitted the case to the jury. After the jury returned a verdict in favor of plaintiff and awarded her $525,000 in damages, the court denied defendants' motions for judgment notwithstanding the verdict (JNOV), a new trial and remittitur.

Defendants now appeal the jury verdict and the denial of the motions, raising the following points for our consideration:

> POINT ONE
>
> THE LOWER COURT ERRED IN DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.
>
>> A. THE LOWER COURT ERRED IN DENYING SUMMARY JUDGMENT ON COUNT II (HOSTILE WORK ENVIRONMENT

---

[1] Summary judgment was granted for defendants on count four of the complaint, alleging intentional infliction of emotional distress. R. 4:46-1.

[2] Count one, alleging quid pro quo sexual harassment, was dismissed on defendants' motion for involuntary dismissal at the end of the State's case. R. 4:37-2(b).

SEXUAL HARASSMENT) OF THE COMPLAINT.

1. THE LOWER COURT ERRED IN CONSIDERING PLAINTIFF'S SHAM AFFIDAVIT SUBMITTED IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT.

2. PLAINTIFF'S ALLEGATIONS FAILED TO MEET THE REQUISITE "REASONABLE WOMAN" STANDARD.

3. PLAINTIFF'S ALLEGATIONS FAILED TO MEET THE NJLAD'S "SEVERE OR PERVASIVE" STANDARD.

4. PLAINTIFF FAILED TO ESTABLISH THAT HER GENDER WAS A "BUT FOR" CAUSE OF DEFENDANTS' ALLEGED CONDUCT.

5. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM SHOULD HAVE BEEN DISMISSED BECAUSE SHE DID NOT PROVE DAMAGES.

B. THE LOWER COURT ERRED IN DENYING SUMMARY JUDGMENT ON COUNT III OF THE COMPLAINT BECAUSE PLAINTIFF WAS UNABLE TO SATISFY THE REQUISITE ELEMENTS OF A NJLAD RETALIATION CAUSE OF ACTION.

1. PLAINTIFF DID NOT SUFFER AN ADVERSE EMPLOYMENT ACTION AS A RESULT OF HER ALLEGED COMPLAINTS OF HARASSMENT.

3

2.    PLAINTIFF DID NOT ESTABLISH A "CAUSAL LINK" BETWEEN HER ALLEGED COMPLAINTS AND HER TERMINATION.

3.    DEFENDANTS[] ESTABLISHED THAT IT TOOK LEGITIMATE NON-DISCRIMINATORY ACTION.

4.    PLAINTIFF COULD NOT SHOW PRETEXT.

POINT TWO

THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTIONS FOR DIRECTED VERDICT AND [JUDGMENT] NOTWITHSTANDING THE VERDICT ON COUNTS II AND III OF THE COMPLAINT.

A.    PLAINTIFF FAILED TO SATISFY THE REQUISITE ELEMENTS OF A NJLAD HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT CLAIM.

1.    PLAINTIFF WAS UNABLE TO SATISFY THE REQUIRED "REASONABLE WOMAN" STANDARD.

2.    PLAINTIFF FAILED TO SATISFY THE NJLAD'S "SEVERE OR PERVASIVE" STANDARD.

B.    PLAINTIFF FAILED TO SATISFY THE REQUISITE ELEMENTS OF A RETALIATION CLAIM.

1.    PLAINTIFF DID NOT SHOW A CAUSAL LINK BETWEEN HER ALLEGED COMPLAINTS AND TERMINATION.

4

2. PLAINTIFF DID NOT SHOW PRETEXT FOR RETALIATION.

POINT THREE

THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR A NEW TRIAL.

A. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF PAST ACTS UNRELATED TO PLAINTIFF.

1. EVIDENCE OF THE 2008 HARASSMENT COMPLAINT BY NAKIA MASHACK AGAINST OSCAR MOLINA SHOULD NOT HAVE BEEN ADMITTED.

2. EVIDENCE OF MR. PERRY'S 2008 VIOLATION OF THE COMPANY'S ELECTRONIC COMMUNICATIONS POLICY AND "SKIRT JOKE" SHOULD HAVE BEEN EXCLUDED.

B. THE TRIAL COURT ERRED IN DENYING DEFENDANTS[] A NEW TRIAL DUE TO PLAINTIFF'S COUNSEL'S IMPROPER AND PREJUDICIAL REPRESENTATIONS DURING SUMMATION.

1. DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE PLAINTIFF'S COUNSEL IMPROPERLY ADVANCED "A TOE THE COMPANY LINE" THEORY AND ACCUSED WITNESSES OF LYING DURING SUMMATION.

2. DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE PLAINTIFF'S

COUNSEL IMPERMISSIBLY IMPLIED TO THE JURY THAT MR. PERRY'S EX-GIRLFRIEND LOOKED JUST LIKE PLAINTIFF DURING SUMMATION.

3. DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE PLAINTIFF'S COUNSEL VIOLATED THE "GOLDEN RULE" DURING SUMMATION.

4. DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE THE JURY AWARDED EXCESSIVE DAMAGES TO PLAINTIFF.

POINT FOUR

THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR REMITTITUR.

A. REMITTITUR OF THE EMOTIONAL DISTRESS DAMAGES AWARD IS WARRANTED BECAUSE THE AWARD IS EXCESSIVE AND UNSUPPORTED BY THE EVIDENCE PRESENTED AT TRIAL.

B. REMITTITUR IS REQUIRED TO REMEDY AN IMPROPERLY EXCESSIVE RETALIATION ECONOMIC DAMAGES AWARD.

We have considered these arguments in light of the record and applicable legal principles. We reject each point and affirm.

I.

We glean the following facts from the record. Rocktenn, a national producer of corrugated boxes for display, acquired the

6

Newark office of a company called Southern Container in September 2008. Perry was the customer service manager at Southern Container, and he remained in the position after Rocktenn acquired the company's Newark office. In November 2010, plaintiff accepted a Customer Service Representative (CSR) position at Rocktenn, earning $45,000 a year. Over the next several months, Perry, her supervisor, engaged in a course of sexually harassing behavior directed at her.

Beginning thirty days after plaintiff was hired, Perry showed her a picture of his girlfriend and told her about their sexual relationship and recent break up. He also commented that his girlfriend thought he had "nice thighs[,]" and repeatedly told plaintiff he loved Latino women. Plaintiff, who is Latino, also noticed Perry looking at her breasts, legs, and backside inappropriately when he spoke to her. On one occasion, he invited her out to eat, but she declined. Over time, Perry's conduct made plaintiff uncomfortable and caused her to avoid going into his office.

Perry also exhibited controlling behavior, exemplified by his attempts to limit plaintiff's interactions with other employees. For example, if plaintiff left her desk to speak to another employee, Perry followed her angrily and told her not to leave her desk without telling him. On one occasion, Perry told

her not to have lunch with Joseph Artale, who worked for Rocktenn's shipping contractor and had worked with plaintiff at her previous job. He also prevented her from completing mandatory training, which required plaintiff to work in other departments, telling her it was unnecessary.

On January 24, 2011, plaintiff emailed Marilyn James, Rocktenn's Regional Human Resources (HR) Director, to explain why she had not completed her mandatory training. In the email, plaintiff said she had told Perry that the training was mandatory, and he had responded that he would discuss the matter with James. However, plaintiff later learned from Luz Aguado-Gomez (Aguado), the Newark HR Director, that Perry never spoke to James about it, prompting plaintiff's email to James.

When James and Steve Donahue, the Newark General Manager, asked Perry about plaintiff's training, he explained plaintiff "was not grasping the basic steps" of the company's software system, which he felt she should master before "spending time with other areas of [the] business." He said she could train in other departments after she had the computer system "down pat and demonstrate[d] that she could deal with the daily workflow . . . ." James informed Perry that the training was mandatory and that if plaintiff was "not meeting the requirements of the job[,] then [they] need[ed] to discuss and document that,"

rather than Perry deciding "without discussion that the training was not necessary."

In December 2010, during a company holiday party, Perry again showed plaintiff along with other employees a picture of his girlfriend, and announced in their presence that his girlfriend was trying to convince him to have a threesome. Then, in a January 2011 incident, Perry put his hand over plaintiff's hand for approximately seven to ten seconds during a work-related conversation and remarked, "Oh I should not be doing this, should I?"

In early 2011, Rocktenn's sales began to decline, with March 2011 being the company's worst month on record. Despite the purported decline in business, records showed that plaintiff worked overtime several times during this period. Nonetheless, Regional Vice President Robert O'Connell instructed managers to cut labor and material costs. Initially, Perry considered firing another CSR with performance issues, but ultimately decided to fire plaintiff, the newest member of the department, and made that recommendation to upper management.

Later, on March 28, 2011, O'Connell emailed James about the status of plaintiff's termination. James asked O'Connell whether to characterize plaintiff's termination as a consequence of her poor performance or as department downsizing, explaining

that the latter would allow them to recall plaintiff if they "[got] busy or need[ed] a receptionist." After James advised she would agree with either decision, O'Connell replied that downsizing was "a good idea for future possibilities." That same day, Perry emailed O'Connell, recommending the company offer a full-time position to Patricia Robinson. Robinson was a CSR who had worked part-time for the company for many years, earning $50 an hour for a thirty-hour workweek.

Two days later, on March 30, 2011, James requested O'Connell's authorization to hire Robinson full-time. Two days after that, in a letter dated April 1, 2011, Perry informed plaintiff that Rocktenn had terminated her employment, effective immediately, due to "a reduction in business . . . ." O'Connell approved Robinson for a full-time position at an annual salary of $65,000 two days after plaintiff was terminated. In the fall of 2011, Rocktenn offered plaintiff a similar position and salary at another Rocktenn facility, but by then, plaintiff had a temporary part-time position at Panasonic and declined Rocktenn's offer because it required a forty-minute commute.

On February 14, 2012, plaintiff filed the LAD complaint, claiming that "[b]eginning in or around December 2010, and continuing through the end of her employment," Perry "publicly belittled" her, cancelled her mandatory training, suggested that

they should go out for drinks, followed her around the office, stared at her breasts, and made inappropriate comments about her body and appearance. She specifically referred to Perry's comments about his preference for Latino women, his suggestion that plaintiff engage in a threesome with Perry and his girlfriend, and the incident where he touched plaintiff's hand inappropriately. In the complaint, plaintiff alleged that she rejected Perry's advances and complained to HR at least nine times but no action was taken. Instead, she claimed Perry retaliated against her, leading to her termination.

During discovery, Rocktenn produced copies of its employee handbook and "Harassment Policy[,]" which all employees were required to sign and acknowledge. According to the handbook, "[u]nwelcome sexual advances, requests for sexual favors[,] and other verbal or physical conduct of a sexual nature" constituted sexual harassment when:

> Submission to such conduct is made either explicitly or implicitly a term or condition of individual employment; or
>
> Submission to, or rejection of such conduct by an individual is used as the basis for employment decisions affecting such an individual; or
>
> Such conduct has the purpose or effect of unreasonable interference with an individual's work performance or creating an intimidating, hostile[,] or offensive working environment.

11 A-4097-14T3

Under the policy, sexually harassing behavior encompassed "a wide range of unwanted, sexually directed behavior" and included, but was not limited to: "unwelcome comments about a person's clothing, body[,] or personal life"; "offensive jokes or . . . inappropriate innuendoes"; "unwanted overtures of a sexual nature"; and "conduct that, even if not objectionable to some employees, creates a working environment that may be considered by others to be hostile or offensive . . . ."

Pursuant to the policy, employees who experienced sexual harassment should file a report with their supervisor or manager, who was required to report the complaint to the HR department. The HR department would investigate allegations of harassment and respond to substantiated acts of harassment with appropriate disciplinary action, which could include termination. Company policy also prohibited retaliation against an employee who complained about harassment, resisted harassment, or cooperated in an investigation. Managers, supervisors, and employees were required to report instances of harassment to the HR department or to the company's compliance hotline, and failure to do so could be grounds for disciplinary action.

At her deposition, plaintiff admitted she never called the company's compliance hotline, but claimed she made at least nine

complaints to Aguado, who merely responded, "that is just the way [Perry] is." According to plaintiff, Aguado did not report the harassment to James until she saw Perry harassing plaintiff firsthand. Plaintiff also said she emailed James directly in January 2011 to ask about her training because she hoped it would "open the door" for a discussion about the harassment, but James never scheduled a meeting with her.

Plaintiff alleged further that, in retaliation for her complaints and consistent rejection of his advances, Perry complained to other employees that she "was making too many mistakes . . . ." However, he "never made any indication to [her] that her performance was slipping[] or that she was making any mistakes." She claimed Perry began to ignore her and avoid eye contact after a meeting with James in March 2011, by which time plaintiff had repeatedly complained to HR about Perry's sexually harassing behavior. Shortly thereafter, on April 1, 2011, James called her into Perry's office and told her that her performance was not an issue, but the company had decided to terminate her because business was slow.

At the close of discovery, defendants moved for summary judgment. Plaintiff opposed the motion and submitted a supporting affidavit reiterating her claims. On September 27, 2013, after oral argument, the motion judge denied the motion as

to counts one, two and three, finding the complaint and deposition testimony sufficient to support the claims. The judge acknowledged defendants' "strong alternative basis" for terminating plaintiff, but concluded the full-time position Rocktenn offered to Robinson was "sufficient evidence of pretext" to raise a genuine issue of fact.

At trial, plaintiff presented the testimony of Nakia Mashack, who was a CSR at Rocktenn from 2008 to 2011. She confirmed that Perry looked at plaintiff's body inappropriately, frequently commented on his attraction to Latino women, and instructed plaintiff not to speak to other men in the workplace. She testified that plaintiff complained to her that Perry's behavior made her uncomfortable. Mashack also described her own experience at the company, including a 2008 incident where another employee forcibly kissed her in front of Perry, who, despite being her acting supervisor at the time, failed to report the incident to the HR department. Perry was later reprimanded by James for not reporting the incident.

At trial, Perry denied plaintiff's allegations of harassment and testified that Aguado never brought plaintiff's complaints to his attention. Although he admitted he liked Latino women, he testified he intended these comments to be jokes and did not mean he was attracted to Latino women. He

14

also claimed plaintiff socialized too much at work and admitted advising her not to have lunch with Artale because he was not a "good" person. However, he denied restricting plaintiff's social interactions with other employees.

Perry also denied making the comment about a threesome at the company holiday party and attributed the comment to another employee. However, contradicting his deposition testimony that he merely "blew it off," at trial, Perry claimed he had yelled at the employee for making the comment. When asked about the discrepancy, between his trial and his deposition testimony, Perry claimed that "blowing it off" and yelling at someone was the same thing.

Regarding his disciplinary record at Southern Container, Perry admitted James and O'Connell disciplined him for pornography found on his computer in August 2008. After a second incident in which a male employee complained about Perry commenting that he would get faster service if he "wore a skirt[,]" Perry acknowledged that James and Robert Shue, the Newark Sales Manager at Southern Container and, later, at Rocktenn, met with him in response to the complaint.

During her trial testimony, James denied having knowledge of plaintiff's complaints against Perry prior to her termination, and testified that plaintiff had only reported

15

Perry's interference with her mandatory training. Although James acknowledged that some of Perry's alleged comments violated the company's harassment policy, she claimed Rocktenn had terminated plaintiff because business had declined and plaintiff was the last hired and least skilled. James also testified about her investigation into the pornography on Perry's computer in 2008 and admitted she never told Aguado about the Southern Container incidents involving Perry after Rocktenn acquired the Newark office.

In her trial testimony, Aguado initially denied that plaintiff had complained about Perry's dominant and controlling behavior, his interference with her training, and his attempts to restrict her interactions with Artale. However, when confronted with her conflicting deposition testimony, she admitted plaintiff had complained about Perry's behavior and claimed she had discussed these complaints with Perry, despite Perry's testimony to the contrary. Aguado also admitted witnessing Perry raise his voice at plaintiff and hearing about his attraction to Latino women, which Aguado did not interpret as a joke. However, Aguado denied that plaintiff told her Perry had asked her on a date or looked at her inappropriately, and denied having knowledge of Perry's previous disciplinary incidents at Southern Container.

At trial, plaintiff presented expert testimony from economist Kristin Kucsma. Kucsma compared plaintiff's $45,000 salary at Rocktenn to her present annual salary of $24,234, and calculated her total economic loss as between $114,364 and $313,637, depending on the inclusion of future economic loss. Defendants neither objected to Kucsma's testimony nor presented their own expert to refute it.

At the close of plaintiff's case, the trial court denied defendants' <u>Rule</u> 4:37-2(b) motion to dismiss plaintiff's claims for hostile work environment sexual harassment and retaliation. On April 17, 2014, the jury returned a verdict for plaintiff, awarding her $75,000 and $50,000 for emotional distress caused by the hostile work environment and retaliation claims, respectively, and $150,000 for her economic loss from the retaliation. The jury also awarded plaintiff a judgment against Perry individually in the amount of $100,000 for emotional distress and $150,000 for economic loss. After the trial, the court awarded plaintiff $402,872 in attorneys' fees and $20,577 in costs, and denied defendants' motions for judgment notwithstanding the verdict, a new trial, remittitur, attorneys' fees, and costs. This appeal followed.

As background, to establish a cause of action for hostile work environment sexual harassment under the LAD, a plaintiff must prove by a preponderance of the evidence "that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 24 (2002) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993)).

Under the first prong, "[a]ll that is required is a showing that it is more likely than not that the harassment occurred because of the plaintiff's [protected status]." Lehmann, 132 N.J. at 605. "Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's [protected status]." Id. at 604. However, as the Lehmann Court noted, "when a plaintiff alleges that she has been subjected to sexual touchings or comments, . . . she has established that the harassment occurred because of her sex." Id. at 605.

To determine whether the conduct was "severe or pervasive" under the second prong, the court must consider "whether a

reasonable person would believe that the conditions of employment have been altered and that the working environment is hostile. Thus the second, third, and fourth prongs are, to some degree, interdependent." Shepherd, 174 N.J. at 24 (citations omitted).

The reasonable person standard views the conduct objectively and does not allow "claims based on the idiosyncratic response of a hypersensitive plaintiff to conduct that is not objectively harassing . . . ." Lehmann, 132 N.J. at 613. "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." Id. at 607 (alteration in original) (quoting Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)).

In evaluating hostile work environment claims, courts must examine the totality of the plaintiff's employment environment and consider: the frequency and severity of the discriminatory conduct; whether it is physically threatening or humiliating, or merely an offensive statement; and whether it unreasonably interferes with the employee's work performance. El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 179 (App. Div. 2005).

The court's "discrimination analysis must concentrate not on individual incidents but on the overall scenario." Lehmann,

132 N.J. at 607 (quoting <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1484 (3d Cir. 1990)). Thus, the court "must consider the cumulative effect of the various incidents, bearing in mind 'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.'" <u>Ibid.</u> (quoting <u>Burns v. McGregor Elec. Indus.</u>, 955 F.2d 559, 564 (8th Cir. 1992)).

Retaliation under the LAD is an unlawful employment practice or unlawful discrimination if a person:

> take[s] reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or . . . coerce[s], intimidate[s], threaten[s] or interfere[s] with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.
>
> [N.J.S.A. 10:5-12(d) (2013).][3]

A claim of retaliation under the LAD follows a burden-shifting framework similar to a failure to promote claim. <u>Henry v. N.J. Dep't of Human Servs.</u>, 204 N.J. 320, 332 (2010). To

_____

[3] N.J.S.A. 10:5-12 was amended on July 1, 2018, after this case was decided. However, the amendment provided no substantive change to the law.

establish a prima facie case of retaliation under the LAD, a plaintiff must show: "(1) [she] was in a protected class; (2) [she] engaged in a protected activity known to the employer; (3) [she] was thereafter subjected to an adverse employment consequence; and (4) there is a causal link between the protected activity and the adverse employment consequence." Victor v. State, 203 N.J. 383, 409 (2010).

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for the employment decision. Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996). If the defendant does so, the plaintiff must then prove that the employer's proffered explanation is pretext. Ibid.

"[A] person engages in a protected activity under the LAD when that person opposes any practice rendered unlawful under the LAD." Young v. Hobert W. Grp., 385 N.J. Super. 448, 466 (App. Div. 2005). To be a protected activity, the complaint must concern some act or practice that violates the LAD. Dunkley v. S. Coraluzzo Petroleum Transporters, 437 N.J. Super. 366, 377 (App. Div. 2014). Proof of the defendant's knowledge of the protected activity is critical. Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 547 (2013).

Generally, "the mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." Young, 385 N.J. Super. at 467 (alterations in original) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)). Temporal proximity, on its own, will only support an inference of causation when the facts are "unusually suggestive of retaliatory motive." Ibid. (quoting Krouse, 126 F.3d at 503). Otherwise, "the plaintiff must set forth other evidence to establish the causal link." Ibid.

III.

Defendants contend the trial court should have granted their motion for summary judgment on the hostile work environment sexual harassment claim because plaintiff failed to establish "any of the[] required elements." Defendants further assert that summary judgment was appropriate on the retaliation claim because plaintiff "failed to satisfy her prima facie burden and was unable to show that Rocktenn's proffered, legitimate reason for termination was somehow pretext for invidious, illegal retaliation." We disagree.

We review a ruling on a motion for summary judgment de novo, applying the same standard governing the trial court.

Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016). Thus, we consider, as the motion judge did, "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540 (1995).

If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law." DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

This standard compels the grant of summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Thus, "[t]o defeat a motion for summary judgment, the opponent must come forward with evidence that creates a genuine issue of material fact."

23

Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)).

A fact is material if it is substantial in nature. See Brill, 142 N.J. at 529. While "conclusory and self-serving assertions by one of the parties are insufficient to overcome the motion[,]" Puder v. Buechel, 183 N.J. 428, 440-41 (2005) (citations omitted), the trial court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

Applying the above standards, we discern no reason to reverse the denial of summary judgment. Defendants contend that in opposing their motion, plaintiff submitted a "sham" affidavit, which contained new facts not mentioned in her deposition. However, at the summary judgment stage, the court's function is not to weigh the evidence, resolve credibility conflicts, or make its own findings of fact; its role is limited to deciding whether disputed questions of material fact exist. Ibid.

Therefore, it would have been improper for the court to make a finding on the veracity of the affidavit. Instead, the

court was required to view the facts in the light most favorable to plaintiff, and, in that light, the court correctly denied summary judgment because plaintiff alleged facts that, if proven, could support a claim for hostile work environment sexual harassment and retaliation.

In fact, plaintiff alleged Perry touched her hand, demanded that she not socialize with Artale, made a lewd comment about a threesome, told her about his sexual relationship with his girlfriend, told her multiple times that he liked Latino women, asked her on a date, and stared at her body inappropriately. Further, plaintiff alleged Perry denied her mandatory training and recommended her for termination after she refused his advances and complained to HR. If true, these allegations establish the prerequisites for a claim of hostile work environment sexual harassment and retaliation to withstand summary judgment.

We reject defendants' contentions that plaintiff failed to meet the reasonable woman standard and displayed unusual sensitivity; failed to establish that Perry's actions were sufficiently pervasive or severe to alter the working conditions; failed to establish that the conduct occurred because of her gender; failed to show damages as a result of the

hostile work environment; and failed to show a causal link between the discrimination and the adverse employment action.

As to the sexual harassment claim, under Lehmann, the severe and pervasive standard can be satisfied when incidents are considered together, as here, that taken alone would be insufficient to state a claim. Id. at 606-07. Further, when a plaintiff alleges that she has been subjected to sexual touchings and comments, as here, she has established that the harassment occurred because of her sex even if some of the comments occurred in the presence of other employees. Id. at 604. Moreover, the LAD does not require a plaintiff to suffer serious psychological harm in order to recover on a hostile work environment sexual harassment claim. Battaglia, 214 N.J. at 552. Rather, "[i]t is the harasser's conduct, not the plaintiff's injury, that must be severe or pervasive." Ibid. (alteration in original) (quoting Lehmann, 132 N.J. at 610).

Turning to the retaliation claim, temporal proximity was sufficient to withstand summary judgment where the alleged harassment by Perry, plaintiff's complaints to HR, and plaintiff's eventual termination all occurred within a six-month period. Within one month of beginning employment at Rocktenn, plaintiff had already filed the first of many complaints against Perry with HR. Within two months of her employment, Perry, who

had authority to make decisions that adversely affected her employment, prevented her from attending mandatory training. Approximately three months later, Perry criticized her performance and recommended her for termination.

Her numerous complaints to HR, in compliance with the company's harassment policy, placed defendants on notice of her protected activity. Contrary to defendants' contention that the decline in business and plaintiff's poor performance were legitimate, non-discriminatory justifications for plaintiff's termination, plaintiff presented compelling evidence of pretext through defendants' failure to notify or document her purported poor performance, and defendants' offer of full-time employment to Robinson at a higher salary than plaintiff's.

## IV.

Turning to the denial of defendants' motions for a directed verdict and JNOV, defendants essentially reiterate their arguments opposing summary judgment. Defendants argue the actions "do not rise to the level of actionable harassment[,]" and "taken collectively, are not 'extreme' or 'pervasive' enough to alter one's working conditions and withstand [d]efendants' motions for directed verdict or JNOV." Further, defendants assert that, other than proximity, plaintiff failed to show a causal link between her alleged complaints and termination and

27                                                              A-4097-14T3

that plaintiff's evidence of pretext consisted of "insufficient conjecture[,]" which failed to counter their "proffered legitimate, non-discriminatory reasons." We disagree.

Motions before the trial court for a directed verdict at the end of plaintiff's case pursuant to Rule 4:37-2, a directed verdict pursuant to Rule 4:40-1 after all the evidence has been presented, and for JNOV under Rule 4:40-2(b), are

> governed by the same evidential standard: "[I]f, accepting as true all the evidence which supports the position of the [non-moving party] and according [the non-moving party] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied."
>
> [Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)).]

See also Brill, 142 N.J. at 535-36. We apply the same standard as the trial court. Boyle v. Ford Motor Co., 399 N.J. Super. 18, 40 (App. Div. 2008).

Here, the trial court denied defendants' motions for a directed verdict and for JNOV, finding "sufficient direct proof to support the jury's findings" of discrimination. As to the motion for a directed verdict at the end of plaintiff's case, the court explained that "giving the plaintiff all favorable inferences," the evidence that "Perry's sexually charged offensive conduct towards [plaintiff] in the workplace created a

hostile work environment" and that defendants' proffered reasons for terminating her were pretext sufficed for submission to the jury. As to the JNOV, the court noted that defendants "advance[ed] their one-sided version of events that the [j]ury rejected, . . . completely ignore[d] the legal standards applicable to the motion," and "ignore[d] the conspicuous fact that the credibility of [defendants'] principal witnesses and their case was severely damaged at the trial, and that the jury just didn't believe [d]efendants' version of events.".

In that regard, the court detailed the proofs submitted at trial, noting that as her supervisor, Perry "directed [p]laintiff on a day to day basis, and had the ability to impact the terms and conditions of [p]laintiff's employment and [p]laintiff's working environment[,]" and later prevented her from attending mandatory training and recommended her for termination after she rebuffed his advances and complained to HR. The court also recited plaintiff's testimony and determined that the record was replete with incidents of Perry's "continuous and repeated" sexually harassing behavior, which was corroborated at trial by other witness accounts. According to the court, "[p]laintiff made multiple complaints involving sexual harassment to HR . . . and nothing was done to stop the harassment[,]" despite their acknowledgement that several of

29                                                           A-4097-14T3

plaintiff's complaints "implicate[d] the company's anti-harassment policy" and constituted "a complaint of harassment."

The court determined that "[p]laintiff's complaints were protected activity within the meaning of the LAD and that her termination was in retaliation for those complaints[,]" thus establishing a causal link between adverse employment actions taken by defendants and plaintiff opposing acts forbidden by the LAD. The court concluded that "[Perry's] conduct, [p]laintiff's complaints, [d]efendants' failure to address them and [d]efendant[s'] manner and act of terminating [p]laintiff" while presenting unpersuasive evidence of non-retaliatory reasons through "proof of a [purported] slow down, further dictate[d] denial of the motion[s]." We are convinced that the court correctly applied the applicable standard and that its decisions to deny defendants' motions are unassailable.

V.

Next, we consider the denial of defendants' Rule 4:49-1(a) motion for a new trial, which we review with considerable deference because only the trial court "has gained a 'feel of the case' through the long days of the trial." Lanzet v. Greenberg, 126 N.J. 168, 175 (1991). However, "a trial court's determination is 'not entitled to any special deference where it rests upon a determination as to worth, plausibility,

consistency or other tangible considerations apparent from the face of the record with respect to which [it] is no more peculiarly situated to decide than the appellate court.'" Caldwell v. Haynes, 136 N.J. 422, 432 (1994) (quoting Dolson v. Anastasia, 55 N.J. 2, 7 (1969)).

"On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). A court should only grant a new trial where "there was a miscarriage of justice under the law." R. 2:10-1; R. 4:49-1(a). A "miscarriage of justice" is a "pervading sense of 'wrongness'" that "can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result." Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (alterations in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).

On appeal, we apply a standard "substantially similar to that used at the trial level[.]" Jastram v. Kruse, 197 N.J. 216, 230 (2008). Indeed, we set aside jury verdicts with "great reluctance, and only in cases of clear injustice." Boryszewski, 380 N.J. Super. at 391.

Here, defendants argue they are entitled to a new trial because the trial court erroneously admitted evidence of Perry's skirt joke, evidence of pornography on Perry's computer, and testimony about Mashack's forced kiss complaint, all of which occurred in 2008. A trial court's decision with regard to the admissibility of evidence "is entitled to great deference and ordinarily should not be disturbed unless it is 'wide of the mark.'" State v. B.M., 397 N.J. Super. 367, 374 (App. Div. 2008) (quoting State v. Fortin, 189 N.J. 579, 597 (2007)). Applying that standard, we are convinced that the trial court did not abuse its discretion.

N.J.R.E. 404(b) provides, in pertinent part, that "evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." Notwithstanding the rule's prohibition, our Supreme Court has held that, in a hostile work environment case, evidence of sexual harassment directed at persons other than the plaintiff may be relevant to the plaintiff's claim of hostile work environment. Lehmann, 132 N.J. at 611.

Generally, "harassment of which a plaintiff is entirely unaware cannot contribute to that environment because plaintiff does not experience it." Fitzgerald v. Stanley Roberts, Inc.,

32                                                    A-4097-14T3

186 N.J. 286, 319 (2006). However, evidence of sexual harassment of other employees, not witnessed by the plaintiff, may be relevant to a claim that an employer had an ineffective sexual harassment policy and can be admitted for that purpose. Id. at 320; see also Gaines v. Bellino, 173 N.J. 301, 313-14 (2002) (allowing plaintiff to challenge defendant's claim of an effective anti-harassment policy); Payton v. N.J. Tpk. Auth., 148 N.J. 524, 536 (1997) (holding employers liable for their own negligence in failing to institute effective anti-harassment policy); Lehmann, 132 N.J. at 621 ("a plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies").

Here, Mashack's 2008 complaint was directly related to plaintiff's 2010 claim that Rocktenn's sexual harassment policies were ineffective. Although the incident occurred before Rocktenn acquired Southern Container, Southern Container and Rocktenn had very similar, if not identical, sexual harassment policies necessitating Perry's filing of a report with HR about the forced kiss on Mashack he witnessed. Further, the same people who investigated the alleged sexual harassment on behalf of Southern Container worked at Rocktenn during plaintiff's tenure in the same capacities. For example, Shue and James, who handled the sexual harassment complaints at

Rocktenn, investigated the 2008 complaint on behalf of Southern Container and told Perry that he should have reported the incident to the HR department.

Contrary to defendants' assertion that the evidence was too remote and inadmissible under N.J.R.E. 403 factors, the evidence was admissible to establish that Rocktenn's sexual harassment policies were ineffective. Aguado, who was in charge of monitoring sexual harassment complaints at Rocktenn's Newark office, was not even aware of Perry's past infractions. Thus, we find no abuse of discretion in admitting the evidence. Likewise, evidence of Perry's skirt joke and pornography on Perry's computer were properly admitted for the same reasons.

Next, defendants argue the court erred in denying a new trial because plaintiff's counsel made improper and prejudicial statements during summation. In particular, defendants take issue with counsel's statement that the "witnesses were willing to bend the truth, to make half truth statements or to flat out lie to tow the company line." Defendants further assert that plaintiff's counsel improperly implied that Perry's girlfriend resembled plaintiff. At trial, defense counsel did not object to these statements or innuendos.

Defendants also argue that the introduction of a PowerPoint presentation outlining relevant trial testimony was improper

because they did not have a chance to review it prior to summation. Defendants argue further that plaintiff's counsel violated the "golden rule" when he asked the jury, "[i]f you were in [plaintiff's] shoes, would you go back and work for this company?" Although their objection was sustained, defendants assert they were entitled to a new trial.

We grant "broad latitude" to counsel to make closing arguments to the jury, Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 32 (App. Div. 1998), but "[s]ummation commentary . . . must be based in truth," and counsel are not free to misstate the facts or the law. Bender v. Adelson, 187 N.J. 411, 431 (2006); see also Biruk v. Wilson, 50 N.J. 253, 260-61 (1967) (disapproving counsel's tactics of making false factual suggestions to jury in closing argument).

When there is no objection to counsel's comments, we apply the plain error rule and reverse only if the course followed by plaintiff's counsel was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; Fitzgerald, 186 N.J. at 318. We are also mindful that "[t]he absence of an objection suggests that trial counsel perceived no error or prejudice" and that their failure to object "prevented the trial judge from remedying any possible confusion in a timely fashion." Bradford v. Kupper Assocs., 283 N.J. Super.

556, 573-74 (App. Div. 1995).  Further, "relief under the plain error rule, at least in civil cases, is discretionary and 'should be sparingly employed.'" Gaido v. Weiser, 115 N.J. 310, 311 (1989) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)).

Here, we find no error, let alone plain error, in plaintiff's counsel challenging the veracity of defendants' witnesses.  Indeed, there were numerous instances at trial where Perry and Aguado contradicted themselves and each other.  Thus, plaintiff's counsel's assertion that defendants' witnesses lacked credibility was neither misleading nor misstating the facts.

As to plaintiff's counsel's remarks about Perry's girlfriend, during summation, counsel commented that she was a Latina with dark, shoulder-length hair, like plaintiff.  We agree that because no evidence of Perry's girlfriend's physical appearance was presented at trial, counsel's reference to her ethnicity and hair was improper.  Even so, we do not find this one reference to be of such a nature as to "have been clearly capable of producing an unjust result." R. 2:10-2.  "Fleeting comments, even if improper, may not warrant a new trial, particularly when the verdict is fair." Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009)

As to plaintiff's counsel's use of the PowerPoint presentation, defendants contend that the PowerPoint contained sections of the trial transcript that were not first disclosed to the court or defendants. However, after defense counsel objected, the court afforded them the opportunity to review the digital presentation, but they declined. Thus, even if there was error, under the doctrine of invited error, defendants cannot now assert that plaintiff's counsel's use of the PowerPoint presentation during summation was improper. Brett v. Great Am. Rec., Inc., 144 N.J. 479, 503 (1996) ("The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error.").

Next we turn to plaintiff's counsel's alleged violation of the golden rule. The golden rule essentially "ask[s] jurors to award damages in the amount that they would want for their own pain and suffering," and its use by a plaintiff's attorney "is still prohibited." Henker v. Preybylowski, 216 N.J. Super. 513, 520 (App. Div. 1987). A golden rule argument suggests to jurors that they should "adopt what they would want as compensation for injury, pain and suffering . . . ." Geler v. Akawie, 358 N.J. Super. 437, 463 (App. Div. 2003).

37

Here, we do not necessarily agree that plaintiff's counsel's query to the jury violated the golden rule because it pertained to defendants' offer of employment to plaintiff, rather than to damages per se. Nonetheless, after sustaining defendants' objection, the court instructed the jury to disregard the comment. A "jury is deemed capable of following a curative instruction to ignore prejudicial matter[,]" Williams v. James, 113 N.J. 619, 632 (1987), and "is presumed to have adhered to the court's instruction[s]." Belmont Condominium Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 97 (App. Div. 2013). As defendants have offered no proof beyond rank speculation that the jury did not follow this curative instruction, we find no error.

VI.

Defendants also claim that a new trial was warranted because the jury award was excessive. Our Supreme Court has held that "a new trial on liability generally cannot be established merely by the excessiveness of a damages award, regardless of its size. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 499 (2001). The Court's rationale was that "there is no logical reason why the size of a damages award, standing alone, should invalidate an otherwise sound liability verdict[,]" and only a new trial on damages could be awarded in

38

this scenario.  Id. at 498.  Therefore, even if the damages were excessive, a reconsideration of damages only would be the appropriate relief, rather than a new trial on all issues.  We will address the challenged jury award in conjunction with the court's denial of defendants' motion for remittitur.

Defendants contend that remittitur was warranted because the emotional and economic damages awards were excessive and unsupported by the evidence.  Defendants assert plaintiff never submitted expert testimony on her emotional distress, and her award for retaliation permitted plaintiff to recover twice for the same conduct.

The trial court denied remittitur, stating that plaintiff's testimony provided ample facts for emotional damages, given her testimony of distress, humiliation, embarrassment, anxiety and extreme discomfort.  The court considered "the demeanor evidence, [and] the appropriate credibility evaluation by the jury all in a light most favorable to the nonmoving party" and concluded that the verdict did not "shock the [conscience] and there [was] no miscarriage of justice to warrant a new trial" on damages.

Rule 4:49-1 permits the court to grant a motion for a new trial when there appears to have been a miscarriage of justice.  When the miscarriage of justice is solely with respect to

damages, however, courts have other options, including remittitur. <u>Fertile</u>, 169 N.J. at 490-92. In such cases, instead of undergoing the expense of a new trial, the court may require that the plaintiff consent to a decrease in the award of damages as a condition for denying the motion for a new trial. <u>Id.</u> at 491-92. If the plaintiff does not consent, the court may order a new damages trial. <u>Johnson v. Scaccetti</u>, 192 N.J. 256, 280-81 (2007), <u>overruled in part by</u>, <u>Cuevas v. Wentworth Grp.</u>, 226 N.J. 480, 485 (2016).

A court should only grant remittitur in the unusual case where the jury's award is "so patently excessive, so pervaded by a sense of wrongness, that it shocks the judicial conscience." <u>Cuevas</u>, 226 N.J. at 485. <u>Cuevas</u> overruled aspects of <u>Ming Yu He v. Miller</u>, 207 N.J. 230 (2011), which directed a judge to rely on personal experience in deciding remittitur. <u>Id.</u> at 503. The new standard is not whether the award shocks a judge's personal conscience, but whether it shocks the judicial conscience. <u>Id.</u> at 486, 503.

<u>Cuevas</u> also departed from the practice espoused in <u>Ming Yu He</u>, of comparing verdicts, calling it a "futile exercise" because plaintiffs' injuries differ and there is no "statistically satisfactory" class of cases that permit such a comparison. <u>Id.</u> at 505-06, 509. Rather, the unique nature of

each case means that there is no "better yardstick" for fixing a monetary amount for emotional distress damages than the jury members' own impartial judgment and experience. Id. at 507. In fact, calculating emotional distress damages in a discrimination case is not a scientific process and is by definition "inexact." Id. at 500. Because no two juries will award the same damages, "a permissible award may fall within a wide spectrum of acceptable outcomes." Ibid.

While acknowledging that courts have granted remittitur in LAD cases, the Cuevas court noted that courts have also upheld "high emotional-distress LAD awards, even in the absence of expert testimony." Id. at 508. Also, a jury may assess emotional distress damages up to the time of trial, id. at 512, and a victim of discrimination may recover for mental anguish and embarrassment and need not prove severe emotional ailments. Tarr v. Ciasulli, 181 N.J. 70, 81 (2004). According to the Cuevas Court, when remittitur is appropriate, it will be "glaring" and "obvious" such as in Besler v. Board of Education of West Windsor, 201 N.J. 544, 555 (2010), where the emotional distress award of $100,000 was vacated when the only instance of discrimination was a school board not permitting the plaintiff to speak at a public meeting. Cuevas, 226 N.J. at 509-10.

> In the end, a thorough analysis of the case itself; of the witnesses' testimony; of the

41

> nature, extent, and duration of the plaintiff's injuries; and of the impact of those injuries on the plaintiff's life will yield the best record on which to decide a remittitur motion.
>
> [Id. at 510.]

Defendants have not shown that the court erred in denying remittitur. Plaintiff's testimony provided support for the jury's relatively high emotional damages award, and defendants' reliance on Grasso v. West New York Board of Education, 364 N.J. Super. 109 (App. Div. 2003) in challenging the award is misplaced. There, we affirmed a reduction of the plaintiff's emotional damages award because the jury found only one of plaintiff's ten lost promotions was for a discriminatory reason. Id. at 114-15. Here, the jury awarded emotional damages for all the discriminatory conduct plaintiff suffered. Further, defendants failed to rebut plaintiff's expert's testimony on economic damages.

Additionally, we do not believe that plaintiff recovered twice for the same conduct, as there were two separate actors and defendants did not object to the jury considering damages against both defendants. Rocktenn was liable for an ineffective sexual harassment policy while Perry was liable for his sexually harassing behavior. A supervisor may be held individually liable for acts forbidden by the LAD. N.J.S.A. 10:5-12(e);

Tarr, 181 N.J. at 83-85. As indicated on the verdict sheet, on the sexual harassment hostile work environment claim, the jury awarded $75,000 in damages for emotional distress against Rocktenn and Perry. On the retaliation claim, the jury awarded $50,000 in damages for emotional distress and $150,000 for economic damages against Rocktenn, and $100,000 in damages for emotional distress and $150,000 for economic damages against Perry. The award does not shock the judicial conscience and was supported by the evidence. Thus, we decline to disturb the court's decision or the jury's award.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION